796 N.E.2d 215 (2003)
343 Ill. App.3d 177
277 Ill.Dec. 500
In re K.S., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
Kevin S., Respondent-Appellant).
No. 2-02-0861.
Appellate Court of Illinois, Second District.
August 27, 2003.
*216 Elliot A. Pinsel (Court-appointed), Daniels, Long & Pinsel, Waukegan, for Kevin S.
Michael J. Waller, Lake County State's Attorney, Waukegan, Martin P. Moltz, Deputy Director, State's Attorneys Appellate Prosecutor, Elgin, Martha M. Gillis, Evanston, for the People.
Justice McLAREN delivered the opinion of the court:
Respondent, Kevin S., appeals from the trial court's adjudication of neglect and the dispositional order in the neglect proceedings regarding his daughter, K.S. We reverse.
On January 16, 2002, the State filed a three-count petition for adjudication of wardship and temporary custody of K.S. Counts I and II, alleging neglect and abuse, respectively, related to K.S.'s mother, Valerie C., and her alleged role in the murder of K.S.'s sibling, Baby Boy C., on January 13. Count III alleged that K.S. was an abused minor in that respondent, the paramour of K.S.'s mother, committed a sex offense against T.V., another sibling of K.S., by attempting to place T.V.'s hand on his penis. The trial court found an immediate and urgent necessity to remove K.S. from the home and place her in a shelter care facility and granted temporary guardianship to the Department of Children and Family Services (DCFS).
On April 11, the State withdrew counts I, II, and III and filed an additional count IV, alleging that K.S. was neglected in that her mother failed to protect her by failing to follow the safety plan of DCFS. Valerie C. stipulated to a factual basis for count IV and that the evidence would prove that K.S. was neglected. The State represented that, if called, DCFS caseworker Evelyn Martinez would testify that she was involved in the investigation of the alleged sexual abuse of T.V. On June 12, 2000, she discussed the safety plan with Valerie and told her that respondent could not have contact with any of her children and could not live in their house. On October 25, 2000, she told Valerie that she was going to recommend that the case be indicated and reiterated that the safety plan was *217 still in effect. Some time after that, Martinez learned that respondent had been living in the house with Valerie and her children. The court was also told that the criminal case against respondent, which arose from the allegation that he had sexually molested T.V., had been dismissed in January 2000.
The court found K.S. neglected based upon "the factual basis as presented and agreed upon by Ms. Hayward [Valerie's attorney] and her client and the State." The court then ordered a social history investigation and ordered respondent to undergo a sexual offender's evaluation. Respondent, through his counsel, stated as follows:
"Just so it is clear on the record, my client is not admitting or stipulating to anything. My client's criminal case was dismissed. In talking with my client[,] I don't feel as his advocate that that sex offender evaluation is necessary because that charge was dismissed, and he has adamantly denied it from day one.
I want the record to show that he doesn't want the child to be adjudicated neglected, and that the criminal case has already been disposed of. He was already incarcerated for that. The case was dismissed. And we don't feel that it is appropriate."
The trial court responded that respondent "absolutely can persist in his denial, but the evaluation is going to be ordered. * * * I am going to order that you follow through with that because I have to make sure that [K.S.] is safe."
On June 28, 2002, the case proceeded to a dispositional hearing. The social history investigation, prepared by Catholic Charities, stated that DCFS had become involved with the family when T.V. and her cousin reported that respondent "had fondled them and sexually molested them." However, the case was closed when Valerie "agreed to a safety plan, and reported that she would not allow any contact between her children" and respondent. According to the report, respondent stated that "the girls lied about the incidents," and he "has denied any responsibility for the sexual molestation report that was indicated by DCFS in 2000." Catholic Charities concluded that such denial "may indicate that [respondent] does not fully understand the children's needs" and further characterized respondent as "in denial about his responsibility" in the DCFS case. Respondent was "reluctant to comply with services" regarding the sexual molestation charge. The report did note that respondent's only criminal conviction was of deceptive practices. However, the report concluded that respondent "needs to acknowledge his role in the previous DCFS allegation of sexual molestation, which was indicated. He needs to complete a sexual offenders assessment, and follow all recommendations of the assessment." At the dispositional hearing, respondent continued to deny any wrongdoing and asked that he not be ordered to complete sexual offender assessment and counseling.
The trial court found K.S. to be a neglected minor, made her a ward of the court, and gave legal guardianship to DCFS. Addressing respondent, the court stated:
"Okay. Here is the situation, and just so you understand, Mr. [S.], I have to look at what is in the best interest of the children.
The issue is not whether the criminal case was dismissed or not. I have no idea why it was dismissed. I have no doubt that it was. I don't even know if it was the same complaining witness. But the issue now is that one of the children says that you sexually molested her. That may not be true. All the *218 more reason to follow through with this evaluation and see what they say. They will be reviewing the reports. They will be reviewing the statement to see if there was a recantation, whatever the situation is. I don't know from what I can see here. But what I can tell you, there is a founded report. There was a statement made by one of the girls. And that you are the father of a young girl, and that I have to make sure that she is protected. So I am going to order the sexual offender evaluation within the next 30 days."
Respondent filed a motion to reconsider, which was denied by the trial court. This appeal followed.
Respondent first contends that the trial court erred in ordering him to complete a sexual offender evaluation and follow the resulting recommendations. The conditions of a dispositional order must have some basis in the evidence. In re Chyna B., 331 Ill.App.3d 591, 597-98, 265 Ill.Dec. 263, 772 N.E.2d 301 (2002). On review, a trial court's dispositional determination will be reversed only if the court's findings of fact are against the manifest weight of the evidence or if the court committed an abuse of discretion by selecting an inappropriate dispositional order. In re J.P., 331 Ill.App.3d 220, 238, 264 Ill.Dec. 464, 770 N.E.2d 1160 (2002).
The complete lack of evidence against respondent in this case leads us to conclude that the trial court's dispositional order was both an abuse of discretion and against the manifest weight of the evidence. The court heard nothing except rank tertiary hearsay regarding the allegations of a sexual offense committed by respondent. At the time that the court found count IV to be proved, it had heard nothing except what Valerie stipulated that DCFS caseworker Martinez would testify to if she were called to testify. In that stipulation, it was stated that Martinez would testify that she was involved in an investigation of the allegation that respondent molested T.V. and that DCFS's "safety plan" prohibited respondent's presence in Valerie's house. It was the violation of this safety plan that formed the basis of the court's finding of neglect. However, the court also heard that the criminal case against respondent, which arose from the same allegations of sexual molestation, was dismissed, as was count III of the petition in this case, which was based on the same allegations. The Catholic Charities report included the statement that the DCFS report regarding the molestation allegations was "indicated." However, respondent consistently denied the allegations, and the Catholic Charities report noted this fact.
The trial court never heard any direct evidence that respondent had committed any sexual offense; the evidence was only a stipulation by a third party, the mother, and a report about a report containing such allegations. While the DCFS report was "indicated," such a designation means only that "credible evidence" of abuse or neglect has been found by DCFS. See S.W. v. Department of Children & Family Services, 276 Ill.App.3d 672, 674, 213 Ill.Dec. 280, 658 N.E.2d 1301 (1995). On the other hand, the court knew that the State had dismissed the criminal charges against respondent and withdrawn the abuse allegations based on that same incident, and that respondent had always denied the allegations. At an adjudicatory hearing, the State must prove allegations of neglect by a preponderance of the evidence. In re S.S., 313 Ill.App.3d 121, 126, 245 Ill.Dec. 808, 728 N.E.2d 1165 (2000). Reference to a DCFS report of "credible evidence" was an insufficient basis for ordering respondent to undergo a sexual offender evaluation. "Credible evidence" is a term of art; labeling evidence as credible *219 in no way denotes that the evidence comports with rules of evidence or procedural due process. The dissent accords this "credible evidence" too much gravity. A finding by a DCFS worker, as capable as the worker may be, does not obviate the need for the State to prosecute an alleged offense and a judge to find that an offense was committed.
The trial court in this case abdicated its role as fact finder, as is evidenced by its explanation of its order to respondent:
"The issue is not whether the criminal case was dismissed or not. I have no idea why it was dismissed. I have no doubt that it was. I don't even know if it was the same complaining witness. But the issue now is that one of the children says that you sexually molested her. That may not be true. All the more reason to follow through with this evaluation and see what they say." (Emphases added.)
The State attempts to bolster that explanation with the following argument:
"Arguably, in the instant matter, the trial court assumed that the Respondent was a sex offender who posed harm to K.S. because without a related evaluation, it had no other course of action consistent with the best interests of K.S." (Emphasis added.)
We note that if count III had not been withdrawn, an adjudicatory hearing would have been a proper and acceptable course of action to determine if respondent was a sex offender. Be that as it may, trial courts are to base decisions on evidence, not assumptions. The absence of evidence is not "[a]ll the more reason" to order a parent to submit to a sexual offender evaluation and possible counseling. Respondent was never given a hearing at which witnesses testified, with the opportunity to cross-examine witnesses and present his own evidence. The State foreclosed this possibility when it dismissed the criminal charges and withdrew the abuse allegations against respondent in count III. Instead, the court ordered the evaluation without any evidence closer than third-hand reports, and it relied on the sexual offender evaluation to prove whether respondent was guilty of the claimed sexual offenses. In addition to the trial court's error of ordering the evaluation at all, we must point out the fallacy of the court's reasoning. We are unaware of any authority that has determined, pursuant to Frye, that such an evaluation may be so utilized. See Frye v. United States, 293 F. 1013 (D.C.Cir.1923). Completion of the evaluation would not establish whether respondent sexually molested T.V. Respondent denied the allegation. In the absence of an admission or stipulation by respondent, only an evidentiary hearing could determine that respondent committed such an offense. If this court were to allow the trial court to order such an evaluation without the benefit of evidence, one shudders to consider what other mischief could occur if uncharged, unsubstantiated, and unproved allegations are mistaken for evidence at either the adjudicatory or the dispositional stage of the proceedings, especially when the party condemned demands a hearing on the merits and is denied that opportunity. The dissent finds this "demeaning" and sees the trial court's actions as nothing "other than trying to reach the right result in this case." Op. 277 Ill.Dec. at 520, 796 N.E.2d at 235. This opinion is not an ad hominem attack on the trial court; however, we do find both error and mischief in the violation of due process rights to confront witnesses and to require proof by at least a preponderance of the evidence, even when it is done to "protect children." If these rights can be sacrificed in such an instance, all *220 other constitutional rights must also be vulnerable.
The dissent reveals the crux of the matter when it describes this case as "gut wrenching" because of the "possible sex abuse" involved. See op. 277 Ill.Dec. at 520, 796 N.E.2d at 235. "Possible" sex abuse, though not alleged in the neglect petition; "possible" sex abuse, though not proved, either through a criminal trial or an adjudicatory hearing; "possible" sex abuse raised only through tertiary hearsay. "Possible" does not rise to the level of proof necessary to order a man to undergo an evaluation and possible counseling for sexual abuse. Such an order based on "possible" acts is patent error. As this court noted in an appeal by one parent from an adjudication of neglect:
"We are dealing here with the future and only possibilities and probabilities can be assessed. To expose respondent's children to a reasonable probability of abuse is something this court will not do. On the other hand, no child in any family is free from the possibility of future abuse and we cannot afford to sever the natural ties between parent and child and cause that loss to both of them on the mere possibility that the child may be abused." (Emphasis in original.) In re Baby Boy Butt, 76 Ill. App.3d 587, 594, 32 Ill.Dec. 54, 395 N.E.2d 1 (1979).
The potential for further mischief can be found in the dissent's interpretation and application of section 2-21(2) of the Juvenile Court Act of 1987(Act) (705 ILCS 405/2-21(2) (West 2000)). The dissent argues that the "broad scope" of section 2-21(2) gave the trial court discretionary power to "order an investigation into the alleged sex abuse." Op. 277 Ill.Dec. at 517, 796 N.E.2d at 232. Apparently, the dissent sees no limit to the size of the net the trial court may cast to find information, as it would allow unreliable, tertiary hearsay to preclude respondent from determining the truth of the charges brought by a nonparty. The dissent finds this to be a "monumental overstatement," arguing that the use of hearsay evidence did not prevent respondent from "attempting to discredit both accuser and accusation." Op. 277 Ill.Dec. at 519, 796 N.E.2d at 234. How is respondent to "discredit" his accuser and the accusation when there never was a hearing at which respondent's accuser testified and was subject to cross-examination? Respondent's accuser never testified at his criminal trial because the charges were dropped. His accuser did not testify at the adjudicatory hearing, where no witnesses were called to testify, nor did she testify at the dispositional hearing. We are also stunned by the dissent's statement that respondent was not prevented "from putting on a defense at the hearing." Op. 277 Ill.Dec. at 519, 796 N.E.2d at 234. We first note that he was not charged with anything by the State at the time of the hearing; the court cannot make up charges as it goes along. Secondly, how was respondent to prove a negative, i.e., that no sexual abuse occurred, especially when his accuser never testified and was never present for cross-examination? The Star Chamber, inter alia, placed a premium on compelling subjects of investigation to admit guilt from their own lips. See People v. Baker, 123 Ill.2d 233, 239, 122 Ill.Dec. 17, 526 N.E.2d 157 (1988). Unfortunately, that attribute is present in this case.
The State further argues that a trial court "need not wait until the child is victimized or emotionally damaged" before removing a child from an injurious environment. While true, it does not mean that actions may be taken against a parent without giving him a hearing and an opportunity to respond to any allegations *221 that would require rehabilitation for allegedly criminal behavior. A case should be decided on the facts in evidence. See In re T.W., 313 Ill.App.3d 890, 892, 247 Ill. Dec. 209, 731 N.E.2d 982 (2000). Here, the "facts" before the court were insufficient to warrant the order of a sexual offender evaluation. The State had the opportunity to prove these allegations of sexual molestation, either in a criminal trial, in an adjudicatory hearing, or at the dispositional hearing in question. It did none of these things. The court cannot presume these allegations to be proved without conducting a hearing, nor can it order respondent to prove that he is not a sexual offender, especially in light of the insubstantial "evidence" of a sexual offense that was presented to the court.
Respondent next contends that the trial court erred when it adjudicated K.S. a neglected minor and did not place custody of her with him. We agree.
The State must prove allegations of neglect by a preponderance of the evidence. S.S., 313 Ill.App.3d at 126, 245 Ill.Dec. 808, 728 N.E.2d 1165. A preponderance of the evidence is an amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not. S.S., 313 Ill.App.3d at 126-27, 245 Ill.Dec. 808, 728 N.E.2d 1165. A trial court's determination of neglect will not be reversed on appeal unless its findings of fact are against the manifest weight of the evidence; this is so because the trial court is in the better position to observe witnesses, assess credibility, and weigh evidence. S.S., 313 Ill.App.3d at 127, 245 Ill.Dec. 808, 728 N.E.2d 1165. As both parents must be adjudged unfit or unable to care for a child before placement with DCFS is authorized, the allegations of neglect must be determined as to both parents, especially where only one separated parent is alleged to have neglected the child. See S.S., 313 Ill.App.3d at 127, 245 Ill.Dec. 808, 728 N.E.2d 1165.
Here, the only allegation of neglect that the State did not withdraw alleged that Valerie created an injurious environment for K.S. because she did not follow the DCFS safety plan. Valerie stipulated to a factual basis for neglect pursuant to this allegation. However, no allegations against respondent remained, and there was no proof, either through stipulation or introduction of evidence, that respondent had neglected K.S. All evidence related to Valerie, not respondent. For this reason, the trial court erred in finding that respondent neglected K.S.
The dissent argues that neglect is not specific to a parent and that the identity of the parent responsible for the neglect is irrelevant at the adjudicatory stage. However, this court has concluded in both S.S. and In re Arthur H., 338 Ill.App.3d 1027, 273 Ill.Dec. 716, 789 N.E.2d 890 (2003), that neglect must be proved with respect to each parent. The dissent finds the rationale for these cases to be specious and based on an erroneous application of section 2-21 of the Act (705 ILCS 405/2-21 (West 2000)). However, this court has determined that the Act did not adequately address the situation, such as the one before us, where "only one separated parent has abused or neglected the child." S.S., 313 Ill.App.3d at 127, 245 Ill.Dec. 808, 728 N.E.2d 1165. The actions in this case appear more serious because, in S.S., both parents were at least alleged to have abused and neglected the child. We also note that in In re C.N., 196 Ill.2d 181, 256 Ill.Dec. 788, 752 N.E.2d 1030 (2001), the minors involved were initially adjudicated neglected as to the mother only. See C.N., 196 Ill.2d at 184, 218, 256 Ill.Dec. 788, 752 N.E.2d 1030. Our supreme court duly noted this fact twice; it seems anomalous that the court would not comment on *222 the apparent error of the procedure in that case if, as the dissent argues, neglect is not specific as to each parent. The analysis contained in S.S. and Arthur H. is not only valid law, it is applicable to the facts in this case.
The dissent's reliance on In re R.B., 336 Ill.App.3d 606, 271 Ill.Dec. 182, 784 N.E.2d 400 (2003), is misplaced. In R.B., the State alleged that the minor was neglected because of an injurious environment, in that the child was exposed to the risk of domestic violence. The mother admitted to the allegation and stipulated to the police reports of an incident of domestic violence between the mother and the respondent, the child's father, when the minor was present. The respondent, whose first appearance in court was at the adjudicatory hearing, was given an opportunity to get an attorney and present any evidence at a future date. The respondent failed to present any evidence, and the trial court adjudicated the minor neglected. On appeal, the respondent argued that the evidence was insufficient to "`prove him guilty'" of neglect. R.B., 336 Ill.App.3d at 614, 271 Ill.Dec. 182, 784 N.E.2d 400.
The Appellate Court, Fourth District, held that the purpose of juvenile proceedings "is to determine the status of the child on whose behalf the proceedings are brought, not to determine any particular person's criminal or civil liability." (Emphasis in original.) R.B., 336 Ill.App.3d at 614, 271 Ill.Dec. 182, 784 N.E.2d 400. At an adjudicatory hearing, the court is to determine whether the minor has been neglected "as alleged in the State's petition and as defined in section 2-3 of the Act." R.B., 336 Ill.App.3d at 614, 271 Ill.Dec. 182, 784 N.E.2d 400. The petition in R.B. alleged that the respondent was involved in the domestic violence that was the basis for the allegation.
In the case before us, K.S. was proved to be neglected "as alleged in the State's petition." However, that petition alleged that K.S. was neglected because of the actions of her mother, not because of respondent's actions. This case does not involve the relative culpability of the parents, as was unsuccessfully argued by the respondent in R.B. It is easy to infer the joint responsibility of parents for neglect that occurs when both parents live with the child, or when the petition alleges that both parents contributed to the neglect, as was the case in R.B. See also Chyna B., 331 Ill.App.3d at 596, 265 Ill.Dec. 263, 772 N.E.2d 301 (where the child fit the definition of a neglected minor whose environment was injurious "by reason of respondent mother's actions and respondent father's inactions in failing to correct the conditions of which he was aware"). However, the petition in this case was not directed against respondent, and the trial court's order does not specifically state that the allegations were directed only against the minor's mother.
Such a generalized adjudication is neither fair nor practical. An innocent parent should not be stigmatized by a finding of neglect that is not based on an allegation against him or her. The dissent argues that such parents are not stigmatized because they are "treated differently at the dispositional phase." Op. 277 Ill.Dec. at 514, 796 N.E.2d at 229. Apparently, the dissent sees no stigma attaching to a parent being ordered to undergo an evaluation and potential counseling for a sexual offense that the parent denies occurred and the State declined to prosecute, let alone prove.
Furthermore, the court is required to set forth findings in the adjudicatory order. Section 2-21 provides that if the court finds that a minor is neglected, "the court shall then determine and put in writing *223 the factual basis supporting that * * * determination." 705 ILCS 405/2-21(1) (West 2000). There is a definite purpose for the statutory requirement. The written order would set forth the grounds that would ultimately provide for a termination of parental rights if there were no reasonable efforts to correct the grounds that resulted in the original adjudication of the child. See 750 ILCS 50/1(D)(m) (West 1998). Placing an order of record that properly conforms to the allegations in the petition and the consequent findings constitutes the benchmark for rehabilitation and progress in each particular case. In re Z.Z., 312 Ill.App.3d 800, 803, 245 Ill. Dec. 220, 727 N.E.2d 667 (2000). The contention of the dissent, that specific findings and adjudications as to the parents are unnecessary, undermines the statutory policy set forth above. How is a parent to achieve reasonable progress toward the return of the minor or reasonable efforts to correct the conditions that were the basis for the removal of the child if the basis for the removal was not of his doing and the pleadings fail to allege the nature and extent of the problems that are to be resolved?
The dissent posits that the "adjudicatory phase is too early in the proceedings to make a final determination on the issue of who is responsible for the neglect because all of the relevant information is not yet available." Op. 277 Ill.Dec. at 513, 796 N.E.2d at 228. We cannot fathom the thought process behind this statement. A neglect petition does not contain merely a blanket allegation that a child is neglected; it must also contain:
"[C]itations to the appropriate provisions of [the] Act, and set forth * * * facts sufficient to bring the minor under Section 2-3 or 2-4 and to inform respondents of the cause of action, including, but not limited to, a plain and concise statement of the factual allegations that form the basis for the filing of the petition * * *." 705 ILCS 405/2-13(2) (West 2000).
It is at the adjudicatory hearing that "the relevant information" regarding the factual allegations contained in the neglect petition is to be presented by the State in its effort to prove the petition. The petition is either proved or not proved at the adjudicatory hearing; that hearing is not some intermediate phase of the proceedings. Any other information is "relevant" only if the petition is proved and the case proceeds to disposition. Again, the dissent fails to address the fact that the only allegation of neglect that remained here involved the child's mother, Valerie. We are not informed by the dissent why the court would be unable to determine who is responsible for the neglect when only the actions of one parent form the basis of the neglect allegations.
At the time of the shelter care hearing, the court found probable cause to believe that K.S. was neglected or abused because of the possible suffocation of her sibling at the hands of her mother and the "[r]isk of harm" due to respondent "being indicated for risk of sexual abuse." The court found immediate and urgent necessity to remove K.S. from the home and place her in a shelter care facility because her mother was in jail and respondent had a "prior indicated report of risk of sexual harm." Reasonable efforts to keep K.S. in the home could not be made because her mother was in jail and respondent "has not availed himself to [sic] any sexual offender treatment and has [sic] prior indicated report."
A fit parent has a superior right to custody of his child that can be superceded only by a showing of good cause to place custody of the child in a third party. S.S., 313 Ill.App.3d at 132, 245 Ill.Dec. 808, 728 *224 N.E.2d 1165. The only allegations against respondent at the time of the shelter care hearing were the DCFS report and his failure to avail himself of sexual offender treatment arising out of an incident that he denied occurred and that the State declined to prosecute. The State had the opportunity to make a showing that placement with a third party was appropriate in this case, through prosecution of either the criminal charge or the abuse allegation. It did neither. The court found that respondent neglected K.S. in the absence of any allegation of neglect against respondent and in the absence of any evidence other than double or tertiary hearsay allegations. While the best interest of the child is the paramount consideration whenever a petition for adjudication of wardship is brought (see S.S., 313 Ill.App.3d at 126, 245 Ill.Dec. 808, 728 N.E.2d 1165), a trial court cannot disregard the evidence phase and proceed directly to the disposition. Therefore, the court's judgment of neglect as to respondent was against the manifest weight of the evidence and must be reversed.
In the absence of a judgment of neglect or any pending abuse or neglect petition against respondent, there is no good cause to overcome respondent's right to custody to his child and leave K.S. in shelter care. Therefore, the adjudication of wardship must be reversed, and guardianship and custody of K.S. must be placed with respondent. There being no judgment or pending cases against respondent, we find no basis for remanding the case, as is recommended by the dissent. The dissent correctly points out that respondent prayed that this court would reverse the trial court's judgment and remand for further proceedings. However, the dissent neglects to read, or fails to understand, the rest of respondent's argument, wherein respondent argues that "the trial court erred by * * * failing to return K.S. to Respondent." We will take respondent at his (printed) word and conclude that respondent did, indeed, seek custody of his daughter.
Contrary to the dissent, the State had notice that respondent wanted K.S. placed with him, and it had the opportunity to address this issue on appeal. We find it ironic that the dissent is more concerned about the State's "opportunity to present an argument" on this issue than it is about respondent's opportunity to respond to hearsay allegations of sexual abuse of a child.
The dissent cites to section 2-10(2) of the Act, which prohibits the return of a minor in shelter care to a parent "until the court finds that such placement is no longer necessary for the protection of the minor." 705 ILCS 405/2-10(2) (West 2000). The dissent then argues that, since the trial court did not make such a finding, custody of K.S. should not be given to respondent. We must question how the trial court could ever make such a finding if the State never attempts to prove the hearsay allegations of sexual abuse, since it was those allegations that were the basis for finding that placement could not be made with respondent at the shelter care hearing. Again, the dissent would place the burden of proving that he was not a sex offender on respondent, apparently by undergoing a sex offender evaluation, instead of placing on the State the burden of proving, even by a preponderance of the evidence, that respondent posed a sexual threat. Mere hearsay allegations may have been sufficient for the court to find that placement with respondent was not appropriate at the time of the shelter care hearing. However, such flimsy, unproved allegations cannot indefinitely be used to separate respondent and his child. The State has an obligation to plead and prove *225 these allegations if it wants to rely on them, and it has failed to do this.
If the State believes that K.S. is jeopardized by living with her father, it can file a new petition and seek shelter care again. However, we cannot allow custody of K.S. to be placed elsewhere if there is no case pending or no judgment of abuse or neglect. We also note that, should the State initiate further proceedings, the doctrines of res judicata, estoppel by judgment, and any other appropriate estoppel, as well as the law of the case, may apply to matters previously raised and decided or that could have been raised and decided in this case.
For these reasons, the judgment of the circuit court of Lake County is reversed.
Reversed.
HUTCHINSON, P.J., concurs.
Justice O'MALLEY, dissenting:
In an enthusiastic misapplication of the best-interest-of-the-child standard, the majority leaps over the trial court and even beyond respondent's request and precipitously awards custody to respondent despite the fact that the majority acknowledges that there is credible evidence that respondent has engaged in sexual abuse of children. It then proceeds to leap beyond any and all issues in this appeal to warn the State, in a purely advisory way, that even if it thinks that this child "is jeopardized by living with her father" (op. 277 Ill.Dec. at 510, 796 N.E.2d at 225), any further efforts to protect her may yield to "res judicata, estoppel by judgment, and any other appropriate estoppel" doctrines (op. 277 Ill.Dec. at 510, 796 N.E.2d at 225). All of this in a case where the best interest of the child is supposed to be paramount.
Additionally, the majority incorrectly concludes that neglect is adjudicated separately with respect to each parent under the Juvenile Court Act (Act) when it holds that the trial court's finding of neglect was against the manifest weight of the evidence "as to respondent." Because the finding of neglect was not improper, the trial court's order was within its authority to conduct an investigation under section 2-21(2) (705 ILCS 405/2-21(2) (West 2000)). The trial court, however, needed to make a finding at the dispositional phase on respondent's fitness before it placed K.S. in the guardianship of DCFS. I would remand to the trial court so that an investigation can be conducted pursuant to section 2-21(2), as well as any other appropriate procedures available to aid the trial court at the dispositional hearing, so that the trial court can make a determination on respondent's fitness.
On the issue of whether neglect is adjudicated separately with respect to each parent, there is a split among our districts, and even among the justices of this district. Consequently, this point will require a rather detailed analysis of the language of the Act. I attempt such an analysis herein.
In my view, however, the most egregious error committed by the majority is that it precipitously awards K.S.'s custody to respondent while at the same time conceding that there is "credible evidence" that he committed sex abuse (op. 277 Ill. Dec. at 503, 796 N.E.2d at 218) and where in his prayer for relief respondent does not even ask for custody to be returned to him. The majority accuses me of not having read or understood the portion of the argument section of respondent's brief where he claims that the trial court erred by failing to award him custody of K.S. Obviously, I have read it, and I think that I understand it. In his prayer for relief respondent asks only that the trial court be reversed and the cause be remanded for further proceedings. What I see as *226 significant is that, although respondent undoubtedly wanted custody, he never imagined that this court would actually give it to him. Even he realizes that our granting him custody at this point is grossly inappropriate.
Awarding custody of K.S. to respondent at this point directly contradicts the express mandate of the Act. Section 2-10(2) of the Act provides:
"Once the court finds that it is a matter of immediate and urgent necessity for the protection of the minor that the minor be placed in a shelter care facility, the minor shall not be returned to the parent, custodian or guardian until the court finds that such placement is no longer necessary for the protection of the minor." (Emphasis added.) 705 ILCS 405/2-10(2) (West 2000).
The trial court made a finding that an immediate and urgent necessity existed to remove K.S. from her home and place her in a shelter care facility. That finding was based in part on the risk that respondent would sexually harm K.S. The trial court has not made a finding that "placement is no longer necessary for the protection of the minor" as section 2-10(2) requires for custody to be returned to a parent. 705 ILCS 405/2-10(2) (West 2000). What is more, the majority does not even make such a finding. Its basis for awarding custody of the minor to respondent is that there is "no judgment or pending cases against respondent." Op. 277 Ill.Dec. at 509, 796 N.E.2d at 224. By now granting custody of K.S. to respondent, the majority is doing what the legislature has expressly forbiddenawarding custody to a parent without first finding that shelter care placement is no longer necessary for the protection of the minor.
To make matters worse, because respondent's prayer for relief does not ask us to grant him custody, the State has had no opportunity to present an argument that shelter care is still necessary for the protection of K.S. The State was not on notice that the issue was being decided in this appeal, as a result, we have not even heard what the State has to say on this issue.
The following chronology of events leading up to the award of custody of K.S. to respondent highlights the majority's error: DCFS becomes involved with K.S. because of respondent's alleged sexual abuse of both K.S.'s sibling and cousin. Pursuant to a DCFS safety plan, K.S.'s mother is ordered not to allow K.S. to have contact with respondent. K.S.'s mother allegedly savagely murders K.S.'s infant sibling. A petition for adjudication is brought regarding K.S. The trial court finds an immediate and urgent necessity to place K.S. in shelter care. An "indicated" DCFS report regarding respondent's alleged sex abuse is distributed to the parties. The abuse count alleging that respondent committed sex abuse as well as the counts relating to the murder are dropped when the mother stipulates to neglect based on her violation of the DCFS safety plan by allowing contact between K.S. and respondent. The court finds K.S. to be neglected and, among other things, orders respondent to complete a sex offender evaluation. Respondent fails to complete the evaluation. At the dispositional phase, the trial court again orders respondent to complete a sex offender evaluation. Respondent appeals. The majority orders custody given to respondent.
It seems apparent that, when the neglect petition was filed, respondent already did not have custody of K.S. because the mother's DCFS safety plan specifically provided that respondent was not to have contact with K.S. Further, neither the DCFS safety plan nor any of the records regarding K.S.'s involvement with DCFS *227 prior to the filing of the neglect petition are part of the record in this appeal. We do not know what occurred in those proceedings, nor do we know the precise facts and circumstances surrounding the safety plan. It simply makes no sense for us to, in effect, overrule those proceedings when they are not before us. The trial court should craft the disposition in this case because it is better aware of the facts and in a superior position to fill in missing facts. In fact, the trial court is in a position to find out if the State intends to file a new petition "as to" respondent and, if it sees fit, can even order the State to file one (see In re D.S., 198 Ill.2d 309, 332-33, 261 Ill.Dec. 281, 763 N.E.2d 251 (2002)). I believe that the majority has acted precipitously by granting relief neither requested by respondent nor available under the Act. Skipping the step of remanding the case to the trial court runs the risk of allowing harm to K.S. that could have been prevented. The majority makes a grave mistake by doing so.
Next, the majority in a purely advisory opinion states that "the doctrines of res judicata, estoppel by judgment, and any other appropriate estoppel" (hereinafter res judicata) may apply to a new petition brought by the State based on respondent's alleged sexual abuse. Op. 277 Ill. Dec. at 510, 796 N.E.2d at 225. I do not see the point of advising the parties what may apply, especially where the majority's hypothesizing on res judicata directly contradicts its own notions about neglect being adjudicated separately with respect to each parent. According to the majority, "the only allegation of neglect that the State did not withdraw alleged that Valerie created an injurious environment for K.S. because she did not follow the DCFS safety plan" and "no allegations against respondent remained." Op. 277 Ill.Dec. at 506, 796 N.E.2d at 221. If the majority really believes that neglect is separate with respect to each parent, then the issue of neglect "as to" respondent was not tried because the count regarding respondent's conduct was dropped. The majority's point is that the issue of neglect "as to" respondent was dropped and was never decided. Thus, under its theory, res judicata would not apply.
Moreover, even if the issue of neglect "as to" respondent had been before the court, res judicata would not apply because the doctrines do not apply with full force to a child custody case. It has been held that "[c]ourts should be cautious in determining when to apply res judicata in child custody cases." In re Marriage of Weaver, 228 Ill.App.3d 609, 616, 170 Ill. Dec. 207, 592 N.E.2d 643 (1992). Further, "[res judicata] should not be strictly applied to bar evidence when the most important consideration is the welfare of the child." Weaver, 228 Ill.App.3d at 616, 170 Ill.Dec. 207, 592 N.E.2d 643. Although the Weaver line of cases comes from divorce custody proceedings, its logic applies with equal force to juvenile court proceedings because the primary purpose of both is to protect the best interests of the child. If respondent confessed tomorrow that he had sexually abused the two minor children, the majority would nonetheless order K.S. to be placed in and to remain in the custody of respondent in deference to principles of res judicata. Such a rule clearly contravenes the Act's purpose of protecting the best interest of the child and is not the law. Moreover, the majority fails to explain why it chooses to interject (in a purely advisory way) this point at all.
The majority concludes that "the court's judgment of neglect as to respondent was against the manifest weight of the evidence." Op. 277 Ill.Dec. at 509, 796 N.E.2d at 224. Neglect is not determined "as to" a particular parent; it refers only to the condition of the child. In re R.B., *228 336 Ill.App.3d 606, 614-15, 271 Ill.Dec. 182, 784 N.E.2d 400 (2003). As one judge explained, "parents are not adjudicated neglectful at the adjudicatory stage of the proceedings under the Act; rather, minors are adjudicated neglected." In re Arthur H., 338 Ill.App.3d 1027, 1042, 273 Ill.Dec. 716, 789 N.E.2d 890 (2003) (Kapala, J., dissenting). In fact, nowhere does the Act mention neglect "as to" a particular parent. That an adjudication of neglect is not specific to a parent is clear from the plain language of the Act, which provides that, at the adjudicatory phase, "the court shall determine whether or not the minor is * * * neglected." 705 ILCS 405/2-21(1) (West 2000). Critically, section 2-21(1) does not direct the court to determine whether the minor is neglected "as to" each parent. Rather, the sole question for the court to determine is whether the child is neglected as defined in the Act. Section 2-3 (705 ILCS 405/2-3 (West 2000)) defines neglect based solely on the condition of the child. For example, section 2-3(1)(b) defines as neglected "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2000). I fail to see how a child could meet this definition, but meet it only as to one parent. The definition focuses exclusively on the child and does not in any way reference the parents. Thus, the issue of which parent is responsible is irrelevant to an adjudication of neglect. Neglect "do[es] not address the question of who may be responsible for such adverse conditions because, in the first instance, that question does not matter." R.B., 336 Ill.App.3d at 614, 271 Ill.Dec. 182, 784 N.E.2d 400. What matters in the first instance is solely whether or not the child's "environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2000).
In In re Chyna B., 331 Ill.App.3d 591, 265 Ill.Dec. 263, 772 N.E.2d 301 (2002), the minor was found to be neglected because "respondent mother had failed to correct the conditions that resulted in a prior adjudication of unfitness to exercise guardianship and/or custody of the minor's sibling." Chyna B., 331 Ill.App.3d at 593, 265 Ill. Dec. 263, 772 N.E.2d 301. Although the allegation in the neglect petition concerned actions only of the mother, the Fourth District affirmed the trial court's decision that the neglect finding also applied to the father:
"It was unnecessary for the trial court to find that Chyna B. was neglected on the basis of any action or inaction by respondent father. Chyna B. fit the definition of `any minor under 18 years of age whose environment is injurious to his or her welfare' (705 ILCS 405/2-3(1)(b) (West 2000)) by reason of respondent mother's actions and respondent father's inactions in failing to correct the conditions of which he was aware. A minor child may be found neglected even though the primary fault for creating the injurious environment rests with one parent." Chyna B., 331 Ill.App.3d at 596, 265 Ill.Dec. 263, 772 N.E.2d 301.
There is good reason not to determine neglect separately "as to" each parent. The adjudicatory phase is too early in the proceedings to make a final determination on the issue of who is responsible for the neglect because all of the relevant information is not yet available. After a child is adjudicated neglected, section 2-21(2) gives the trial court the power to order an investigation of, among other things, the child's family situation to assist it at the dispositional hearing. 705 ILCS 405/2-21(2) (West 2000). As the supreme court has noted, "other serious conditions, existing at the time the child is removed, may become known only after removal, following further investigation of the child, parent and family situation." In re C.N., 196 *229 Ill.2d 181, 214, 256 Ill.Dec. 788, 752 N.E.2d 1030 (2001).[1] It would make little sense to make a final determination on parental responsibility before the results of the investigation were available to the court. As the R.B. court explained, "[i]f the State proves the neglect allegation, then causationand remediationcan and should be addressed by the trial court at the dispositional hearing." R.B., 336 Ill.App.3d at 615, 271 Ill.Dec. 182, 784 N.E.2d 400. Moreover, the trial court does make, "to the extent possible," a preliminary finding on the issue of parental responsibility at the adjudicatory phase under section 2-21(1). 705 ILCS 405/2-21(1) (West 2000). Parents whose actions or omissions are not found under section 2-21(1) to be the basis of the neglect finding are treated differently at the dispositional phase. See 705 ILCS 405/2-23(a) (West 2000). For this reason, such parents are not "stigmatized" as the majority suggests. Op. 277 Ill.Dec. at 507, 796 N.E.2d at 222.
The majority's misguided notion that a child is adjudicated neglected separately with respect to each parent can be traced to In re S.S., 313 Ill.App.3d 121, 245 Ill. Dec. 808, 728 N.E.2d 1165 (2000). That case concluded that it was "necessary to determine the neglect allegations as to both parents" because of section 2-27's (705 ILCS 405/2-27 (West 2000)) provision that "both parents must be adjudged unfit or unable to care for the child before placement with DCFS is authorized." S.S., 313 Ill.App.3d at 127, 245 Ill.Dec. 808, 728 N.E.2d 1165. S.S. explicitly based its holding on section 2-27. S.S., 313 Ill. App.3d at 127, 245 Ill.Dec. 808, 728 N.E.2d 1165. The problem is that S.S. applied section 2-27 to the wrong stage of the proceedings. Section 2-27 speaks only to the requirements for placing a child in the custody of DCFS at the dispositional stage. 705 ILCS 405/2-27 (West 2000). This "fitness" finding has nothing whatsoever to do with adjudicating a child neglected, which neither places a child in the custody of DCFS nor is done at the dispositional stage. 705 ILCS 405/2-21 (West 2000). Thus, section 2-27 provides no support for the premise that children are adjudicated neglected separately with respect to each parent. The mistake is then repeated in Arthur H., which cites S.S., but not any provision of the statute, for the same rule. Arthur H., 338 Ill.App.3d at 1034, 273 Ill.Dec. 716, 789 N.E.2d 890.
The majority apparently concedes that the reasoning behind S.S., and by extension Arthur H., was specious, as it attempts no defense of the section 2-27 rationale behind those cases. The majority, however, has posited an alternative argument in favor of the same rule. According to the majority, the Adoption Act's provision that parental rights may be terminated for "[f]ailure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent, or (ii) to make reasonable progress toward the return of the child" is inconsistent with a general adjudication of neglect. 750 ILCS 50/1(D)(m) (West 2000). Initially, I note the oddity that the majority looks to a provision of the Adoption Act to determine the meaning *230 of the language of section 2-3 of the Juvenile Court Act instead of looking at the language of section 2-3 itself. Even ignoring this problem, I disagree with the majority's reasoning. Section 1(D)(m) of the Adoption Act references a parent's failure to correct the condition that was the basis for removal of the child, not the basis for adjudication of neglect.[2] Thus, I fail to see where section 1(D)(m) has any bearing on an adjudication of neglect, let alone where it suggests that an adjudication of neglect is done separately "as to" each parent. Moreover, the unfitness finding necessary for removal, unlike an adjudication of neglect, actually is done separately with respect to each parent. 705 ILCS 405/2-27 (West 2000); In re M.K., 271 Ill.App.3d 820, 828, 208 Ill.Dec. 242, 649 N.E.2d 74 (1995).
The majority proceeds to make the unsupported claim that the "definite purpose" of section 2-21(1) of the Act, which requires the trial court to "specify, to the extent possible, the acts or omissions or both of each parent * * * that form the basis of the court's findings" (705 ILCS 405/2-21(1) (West 2000)), is to "set forth the grounds that would ultimately provide for a termination of parental rights if there were no reasonable efforts to correct [them]." Op. 277 Ill.Dec. at 508, 796 N.E.2d at 223. Because section 1(D)(m) requires the parent to correct the condition that was the basis for removal, not to correct the condition that was the basis for the adjudication of neglect, it would seem more logical for the court at the termination hearing to look at the written factual basis for the finding of unfitness required by section 2-27 that led directly to the removal. Additionally, the more explicit "definite purpose" of the trial court's findings made pursuant to section 2-21(1) is to determine under what circumstances custody of a minor in shelter care may be restored to a parent at the dispositional phase:
"[I]n any case in which a minor is found by the court to be neglected or abused under Section 2-3 of this Act, custody of the minor shall not be restored to any parent * * * whose acts or omissions or both have been identified, pursuant to subsection (1) of Section 2-21, as forming the basis for the court's finding of * * * neglect, until such time as a hearing is held on the issue of the best interests of the minor and the fitness of such parent * * * to care for the minor without endangering the minor's health or safety, and the court enters an order that such parent * * * is fit to care for the minor." 705 ILCS 405/2-23(a) (West 2000).
Significantly, the part of section 2-23(a) that distinguishes parents found to be at fault under section 2-21(1) is surplusage if an adjudication of neglect is separate "as to" each parent. Under the majority's rule, the child of a parent not responsible for "forming the basis of the court's finding of * * * neglect" is not neglected "as to" that parent in the first place. If this rule were accurate, there would be no point to distinguishing parents who had been found to be responsible for the neglect under section 2-21(1) because all parents whose child was neglected "as to" them would necessarily be responsible for the neglect. The use of the section 2-21(1) finding to distinguish parents responsible for the neglect would be pointless and surplusage. I think that the Act is clear *231 that an adjudication of neglect is not specific "as to" a parent.
Next, the trial court's determination that K.S. was neglected was not against the manifest weight of the evidence. "A minor child may be found neglected even though the primary fault for creating the injurious environment rests with one parent." Chyna B., 331 Ill.App.3d at 596, 265 Ill.Dec. 263, 772 N.E.2d 301. K.S. lived with her mother. The mother is alleged to have murdered K.S.'s infant sibling in a particularly horrific fashion. Possibly because she was charged with murder, the mother thought it prudent to stipulate to neglect based on facts unrelated to the death of K.S.'s sibling. Given the fact that K.S. lived with her mother, who has stipulated to neglect, the trial court's finding that K.S. was neglected was not against the manifest weight of the evidence.
The majority apparently has some problem regarding stipulated testimony although it never explains what that problem is. The majority states that the "court never heard any direct evidence" (emphasis in original) (op. 277 Ill.Dec. at 503, 796 N.E.2d at 218) regarding the sexual abuse, "only a stipulation" (emphasis added). Op. 277 Ill.Dec. at 503, 796 N.E.2d at 218. The majority complains that the court heard only what "caseworker Martinez would testify to if she were called to testify." (Emphasis in original.) Op. 277 Ill. Dec. at 503, 796 N.E.2d at 218. Stipulations are encouraged and commonplace. Underlining a description of them does not call into question their reliability. What is notably absent from the majority's lamentations regarding the stipulated testimony is any comment regarding an objection by respondent to allowing Martinez's testimony to come in only through stipulation.
Incredibly, the majority repeatedly emphasizes that respondent was not part of the reason this child was found to be neglected. The majority notes that the only basis for the neglect finding was that Valerie did not follow the safety plan and then states that "all evidence related to Valerie, not respondent." (Op. 277 Ill.Dec. at 506, 796 N.E.2d at 221). I find this statement amazing and I cannot comprehend how the majority can suggest that respondent had nothing to do with the safety plan. The plan had only one purpose, to keep respondent away from the child. The violation was that he had contact with the child. Furthermore, even if respondent did not agree with the safety plan, he did not have the right to act in defiance of the trial court and violate it. In Chyna B., where the allegation in the neglect petition mentioned only the conduct of the mother, the court, nevertheless, held that the father failed to "correct the conditions of which he was aware." Chyna B., 331 Ill.App.3d at 596, 265 Ill.Dec. 263, 772 N.E.2d 301. Here, respondent was not just aware of the condition that was the basis of the neglect petition; he was the condition.
Once K.S. was adjudicated neglected, it was within the trial court's discretion to order a sex offender evaluation because there was evidence presented that respondent had committed a sex offense. The majority relies on its view that respondent's alleged commission of a sex offense was "uncharged" in the neglect petition. However, our supreme court has held that even if an issue is not alleged in the neglect petition, it can still be a basis for a service plan or dispositional order. C.N., 196 Ill.2d at 214, 256 Ill.Dec. 788, 752 N.E.2d 1030. The supreme court stated that "the relevant issues are not `frozen' at the moment custody of the child is taken." C.N., 196 Ill.2d at 213-14, 256 Ill.Dec. 788, 752 N.E.2d 1030. Rather, the necessity of considering other conditions that later come to light is reflected in the "broad scope" of the investigation that the trial *232 court is authorized to order under section 2-21(2) (705 ILCS 405/2-21(2) (West 2000)), after an adjudication of neglect. C.N., 196 Ill.2d at 214, 256 Ill.Dec. 788, 752 N.E.2d 1030. Thus, "it makes no sense to so narrowly limit what the trial court can order a respondent parent to do following an adjudication of neglect, abuse, or dependency." In re C.S., 294 Ill.App.3d 780, 789, 229 Ill.Dec. 225, 691 N.E.2d 161 (1998); see also Chyna B., 331 Ill.App.3d at 597-98, 265 Ill.Dec. 263, 772 N.E.2d 301 ("the conditions of a dispositional order need not relate solely to the grounds for adjudication of wardship").
The trial court had the discretionary power to order an investigation into the alleged sex abuse under the "broad scope" (C.N., 196 Ill.2d at 214, 256 Ill.Dec. 788, 752 N.E.2d 1030) of section 2-21(2) (705 ILCS 405/2-21(2) (West 2000)). Section 2-21(2) provides:
"To assist the court in [deciding whether it is in the best interests of the minor to be made a ward of the court] and other determinations at the dispositional hearing, the court may order that an investigation be conducted and a dispositional report be prepared concerning the minor's physical and mental history and condition, family situation and background, economic status, education, occupation, history of delinquency or criminality, personal habits, and any other information that may be helpful to the court." (Emphasis added.) 705 ILCS 405/2-21(2) (West 2000).
Given that there was evidence presented, hearsay or otherwise, that respondent committed a sex offense, it was not an abuse of discretion for the trial court to order further investigation before placing custody of K.S. with respondent. The majority misses the point when it states that "`possible' [sex abuse] does not rise to the level of proof necessary to order a man to undergo an evaluation and possible counseling for sexual abuse."[3] Op. 277 Ill.Dec. at 505, 796 N.E.2d at 220. It is paradoxical to require the trial court to have proof of sex abuse before it can order an investigation of sex abuse. Obviously, it makes no sense to make proof a prerequisite to ordering an investigation, the purpose of which is to determine whether there is proof. The majority cites In re Baby Boy Butt, 76 Ill.App.3d 587, 32 Ill.Dec. 54, 395 N.E.2d 1 (1979), for the premise that an order based on possible sex abuse is "patent error." Op. 277 Ill.Dec. at 505, 796 N.E.2d at 220. Butt, however, dealt with the proof necessary to place a child in the guardianship of DCFS, not the amount of evidence necessary to order an investigation under section 2-21(2). In re Butt, 76 Ill.App.3d at 594, 32 Ill.Dec. 54, 395 N.E.2d 1. There is a wide chasm between these two issues. Thus, Butt is inapplicable. The hearsay evidence that one of K.S.'s siblings and K.S.'s cousin accused respondent of sexually molesting them was enough to justify an investigation under section 2-21(2).
The real question is whether the sex offender evaluation fits within the "broad scope" (C.N., 196 Ill.2d at 214, 256 Ill.Dec. 788, 752 N.E.2d 1030) of the investigatory powers granted to the trial court under section 2-21(2). The majority then states that "[c]ompletion of the evaluation would not establish whether respondent sexually molested T.V." Op. 277 Ill.Dec. at 504, 796 N.E.2d at 219. The majority then proceeds to "shudder[] to consider what other mischief could occur if uncharged * * * allegations are mistaken for evidence." Op. 277 Ill.Dec. at 504, 796 N.E.2d at 219. I do *233 not understand how the majority is so sure what the evaluation would or would not establish. The only thing we know about what the evaluation process would entail is what the trial court said about it. According to the trial court, the evaluators were to review the reports and the children's statements to see if there were credible recantations and to see "`whatever the situation is.'" (Emphasis added.) Op. 277 Ill.Dec. at 503, 796 N.E.2d at 218. The majority apparently has become hung up on the label, "evaluation," and drawn some unstated and unjustified conclusions based on that word. In fact, as the trial court clearly indicated, it expected that the "evaluation" would be exactly the kind of investigation contemplated by section 2-21(2). Such a process might very well establish whether there were credible recantations by the children or a confession by respondent or, of course, any of the unlimited possibilities between those two extremes.
The majority never states what the evaluation will entail, but I surmise that it concludes that the evaluation will be limited to some sort of psychological profile of respondent. Nothing in the record supports such an assumption, and the comments of the trial court that ordered it absolutely belie it. But even if the trial court had ordered only a psychological profile, I see the trial court's responsibility and discretion under section 2-21(2) as broad enough to allow this. It is not unreasonable that respondent should be asked to participate in the investigation, given the unique nature of juvenile proceedings.
Even if the majority believes that the sex offender evaluation is outside the scope of section 2-21(2), it is still inappropriate to reverse the neglect finding, let alone place K.S. in respondent's custody. The majority would be better served to remand to the trial court, either so that it can clarify what it meant by a sex offender evaluation or so that it can order an investigation that conforms to whatever the majority believes the "broad" scope of section 2-21(2) to be.
Focusing on what in fact the trial court contemplated in its order demonstrates the majority's error in accusing the trial court of abdicating its role as fact finder. The majority quotes the trial court's explanation, chiding it by italicizing for emphasis each of the trial court's acknowledgments of what it did not know. See op. 277 Ill.Dec. at 504, 796 N.E.2d at 219. These acknowledgments were hardly abdications; they were exactly the sorts of things the Act contemplates will be investigated pursuant to section 2-21(2). The trial court never said that it intended to automatically adopt the report generated by the evaluation process or that respondent would be prohibited from challenging it at the dispositional hearing. Thus, the majority's charge that the trial court "relied on the sexual offender evaluation to prove whether respondent was guilty of the claimed sexual offenses" (op. 277 Ill.Dec. at 504, 796 N.E.2d at 219) is unfounded. As section 2-21(2) expressly states, the report is to assist the court at the dispositional hearing. It makes no sense to accuse the trial court of abdicating its role when it orders proceedings authorized by the Act to assist it.
The majority states: "[W]e must point out the fallacy of the court's reasoning. We are unaware of any authority that has determined, pursuant to [Frye v. United States, 293 F. 1013 (D.C.Cir.1923),] that such an evaluation may be so utilized." Op. 277 Ill.Dec. at 504, 796 N.E.2d at 219. The majority's sua sponte suggestion that a sex offender evaluation fails the Frye test is erroneous. In Frye, a federal appellate court affirmed a district court's determination *234 that a lie detector test had not "yet gained such standing and scientific recognition among physiological and psychological authorities" as would justify the courts in admitting it. Frye, 293 F. at 1014. Here no party has raised Frye or adduced evidence about the scientific standing of a sex offender evaluation. Worse, we do not even know what is meant by the term "sex offender evaluation." Thus, there is no basis at this point for the majority to even offer a guess as to whether or not the evidence yet to be produced by the evaluation will be admissible under Frye.
Finally, the majority states: "Apparently, the dissent sees no limit to the size of the net the trial court may cast to find information, as it would allow unreliable, tertiary hearsay to preclude respondent from determining the truth of the charges brought by a nonparty." Op. 277 Ill.Dec. at 505, 796 N.E.2d at 220. This is a perplexing statement. Use of hearsay evidence is specifically authorized by the Act. 705 ILCS 405/2-18(4)(c), 2-22(1) (West 2000). Whether or not the hearsay evidence was "tertiary" misses the point. Respondent does not question that the two children accused him of sex abuse but, rather, maintains that the children lied. Thus, the factual content of the Catholic Charities report, i.e., whether or not the two children said that respondent sexually abused them, was never at issue. The record shows that the DCFS report, on which the Catholic Charities report was based, was distributed to the parties. It was not entered into evidence because there was no reason for it to be. In this case, there was no functional difference between "tertiary" evidence and simple hearsay, and the Act specifically authorizes consideration of hearsay without limitation on the basis of it being "tertiary." 705 ILCS 405/2-18(4)(c), 2-22(1) (West 2000). The majority's assertion that the use of hearsay evidence precludes respondent from "determining the truth of the charges brought by a nonparty" (op. 277 Ill.Dec. at 505, 796 N.E.2d at 220) is a monumental overstatement. It is true that use of hearsay evidence prevents respondent's cross-examination of the witness. However, this handicap is compensated for by the fact that the hearsay evidence is accorded lesser weight. 705 ILCS 405/2-18(4)(c) (West 2000). Although respondent did not avail himself of this opportunity, the hearsay evidence did not prevent him from putting on a defense at the hearing and attempting to discredit both accuser and accusation. Importantly, the stipulated testimony and the hearsay evidence are not being used to force respondent to undergo sex offender treatment or, for that matter, as a basis for an unfitness finding under section 2-27. They are being used as a basis to find more information pursuant to section 2-21(2). In my view, this purpose is properly commensurate with the lower weight accorded to hearsay evidence.
The current procedural posture of this case presents a significant issue. The trial court entered a dispositional order that gave guardianship of K.S. to DCFS and placed her in the custody of her maternal grandmother. Section 2-27, however, requires that before the trial court may take such action it must make a determination that "the parents, guardian, or legal custodian of [the] minor adjudged a ward of the court are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents, guardian or custodian." 705 ILCS 405/2-27(1) (West 2000). The trial court made no such finding.
*235 The matter should be remanded (as respondent requests) so that the trial court can conduct a hearing to determine respondent's fitness and ability to care for K.S. The trial court should have available the reports generated as a result of any evaluations or investigations conducted pursuant to section 2-21(2). Obviously respondent may participate in such a hearing. Consequently, the majority is wrong when it defends its position by complaining that, otherwise, actions will be taken against respondent without a hearing and the opportunity to respond to the allegations.
I close by distancing myself from the demeaning tone that the majority has taken towards the trial court. For example, the majority states, "one shudders to consider what other mischief could occur if uncharged, unsubstantiated, and unproved allegations are mistaken for evidence." Op. 277 Ill.Dec. at 504, 796 N.E.2d at 219. The implication that the trial court was guilty of "mischief" is uncalled for. Generally, these types of cases are emotionally difficult for everyone involved, including trial judges. This case is particularly gut wrenching given that it involves the gruesome murder of an infant and the possible sex abuse of other children. The trial court stated: "[T]here is a founded report [regarding sex abuse]. There was a statement made by one of the girls. And that you are the father of a young girl, and that I have to make sure she is protected." The job of the trial courts in these cases is difficult enough. Even when they err, there is no need for us to insult them. Furthermore, it is not error, let alone mischief, to attempt to protect children from such an injurious environment. That the majority sees the evidence differently than the trial court does not mean that the trial court engaged in anything other than trying to reach the right result in this case.
For the reasons outlined above, I would remand for further proceedings consistent with my dissent.
NOTES
[1] The majority points out that C.N. makes reference to a trial court's finding of neglect as to the mother that occurred prior to a second adjudication of neglect that applied to both parents. C.N., 196 Ill.2d at 184, 256 Ill.Dec. 788, 752 N.E.2d 1030. However, C.N. merely described the trial court's actions and did not address the issue of whether neglect is determined separately "as to" each parent. C.N., 196 Ill.2d at 184, 256 Ill.Dec. 788, 752 N.E.2d 1030. Additionally, C.N. is factually distinct because, in that case, the father appears to have had no notice of the neglect proceeding that the majority points to. C.N., 196 Ill.2d at 184, 256 Ill.Dec. 788, 752 N.E.2d 1030.
[2] While these two determinations are in some respects similar, they are made at different stages of the proceedings and the factual basis of each, which may or may not consist of the same facts (see In re C.N., 196 Ill.2d 181, 256 Ill.Dec. 788, 752 N.E.2d 1030 (2001)), is recorded by the court in a separate written finding.
[3] Although the majority intermittently refers to sex abuse counseling in its opinion, the trial court at no time ordered sex abuse counseling.