No. 2--02--0861                                                    filed 6/6/06

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| In re K.S., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| | ) | |
| | ) | No. 02--JA--14 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Kevin S., | ) | Valerie Boettle Ceckowski, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the opinion of the court:

In 2002, K.S. was adjudicated a neglected minor, made a ward of the court, and placed under the legal guardianship of the Department of Children and Family Services (DCFS). Respondent, Kevin S., the minor's father, appealed, and this court, among other things, reversed the adjudication of wardship and ordered that guardianship and custody of K.S. be placed with respondent. See In re K.S., 343 Ill. App. 3d 177 (2003). Our supreme court denied the State's petition for leave to appeal but, in an exercise of the court's supervisory authority, directed this court to vacate our judgment and reconsider it in light of In re Arthur H., 212 Ill. 2d 441 (2004). After such reconsideration, we affirm in part, reverse in part, and remand.

On January 16, 2002, the State filed a three-count petition for adjudication of wardship and temporary custody of K.S. Counts I and II, alleging neglect and abuse, respectively, related to K.S.'s mother, Valerie C., and her alleged role in the murder of K.S.'s sibling, Baby Boy C., on January 13. Count III alleged that K.S. was an abused minor in that respondent committed a sex offense against T.V., another sibling of K.S., by attempting to place T.V.'s hand on his penis. The trial court found an immediate and urgent necessity to remove K.S. from the home and place her in a shelter care facility, and it granted temporary guardianship to DCFS.

On April 11, the State withdrew counts I, II, and III and filed an additional count IV, alleging that K.S. was neglected in that her environment was injurious to her welfare because Valerie failed to protect her by failing to follow the safety plan of DCFS. Valerie stipulated to a factual basis for count IV and that the evidence would prove that K.S. was neglected. The State represented that, if called, DCFS caseworker Evelyn Martinez would testify that she was involved in the investigation of the alleged sexual abuse of T.V. On June 12, 2000, Martinez discussed the safety plan with Valerie and told her that respondent could not have contact with any of her children and could not live in their house. On October 25, 2000, she told Valerie that she was going to recommend that the case be indicated, and she reiterated that the safety plan was still in effect. Some time after that, Martinez learned that respondent had been living in the house with Valerie and her children. The court was also told that the criminal case against respondent, which arose from the allegation that he had sexually molested T.V., had been dismissed in January 2000.

The court found K.S. neglected, based upon "the factual basis as presented and agreed upon by Ms. Hayward [Valerie's attorney] and her client and the State." The court then ordered a social history investigation and ordered respondent to undergo a sexual offender evaluation. Respondent, through his counsel, stated as follows:

"Just so it is clear on the record, my client is not admitting or stipulating to anything. My client's criminal case was dismissed. In talking with my client[,] I don't feel as his advocate that that sex offender evaluation is necessary because that charge was dismissed, and he has adamantly denied it from day one.

I want the record to show that he doesn't want the child to be adjudicated neglected, and that the criminal case has already been disposed of. He was already incarcerated for that. The case was dismissed. And we don't feel that it is appropriate."

The trial court responded that respondent "absolutely can persist in his denial, but the evaluation is going to be ordered. If they tell me you don't need any treatment, great, wonderful. All the better. But I am going to order that you follow through with that because I have to make sure that [K.S.] is safe."

On June 28, 2002, the case proceeded to a dispositional hearing. The social history investigation, prepared by Catholic Charities, stated that DCFS had become involved with the family when T.V. and her cousin reported that respondent "had fondled them and sexually molested them." However, the case was closed when Valerie "agreed to a safety plan, and reported that she would not allow any contact between her children" and respondent. According to the report, respondent stated that "the girls lied about the incidents" and he "has denied any responsibility for the sexual molestation report that was

indicated by DCFS in 2000." Catholic Charities concluded that such denial "may indicate that [respondent] does not fully understand the children's needs" and further characterized respondent as "in denial about his responsibility" in the DCFS case. Respondent was "reluctant to comply with services" regarding the sexual molestation charge. The report did note that respondent's only criminal conviction was of deceptive practices. However, the report concluded that respondent "needs to acknowledge his role in the previous DCFS allegation of sexual molestation, which was indicated. He needs to complete a sexual offenders assessment, and follow all recommendations of the assessment." At the dispositional hearing, respondent continued to deny any wrongdoing and asked that the court not order him to complete a sex offender assessment or "make him do sex offender counseling." No witnesses testified at the hearing. After hearing argument, the trial court found K.S. to be a neglected minor, made her a ward of the court, and gave legal guardianship to DCFS. Addressing respondent, the court stated:

"Okay. Here is the situation, and just so you understand, Mr. [S.], I have to look at what is in the best interest of the children.

The issue is not whether the criminal case was dismissed or not. I have no idea why it was dismissed. I have no doubt that it was. I don't even know if it was the same complaining witness. But the issue now is that one of the children says that you sexually molested her. That may not be true. All the more reason to follow through with this evaluation and see what they say. They will be reviewing the reports. They will be reviewing the statement to see if there was a recantation, whatever the situation is. I don't know from what I can see here. But what I can tell you, there is a founded report. There was a statement made by one of the girls.

And that you are the father of a young girl, and that I have to make sure that she is protected. So I am going to order the sexual offender evaluation within the next 30 days."

Respondent filed a motion to reconsider, which was denied by the trial court. An appeal to this court followed.

Respondent first contends that the trial court erred when it adjudicated K.S. a neglected minor.

The State must prove allegations of neglect by a preponderance of the evidence. In re S.S., 313 Ill. App. 3d 121, 126 (2000). A preponderance of the evidence is an amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not. S.S., 313 Ill. App. 3d at 126-27. A trial court's determination of neglect will not be reversed on appeal unless its findings of fact are against the manifest weight of the evidence; this is so because the trial court is in the better position to observe witnesses, assess credibility, and weigh evidence. S.S., 313 Ill. App. 3d at 127. Our supreme court has held that the only question to be resolved at an adjudicatory hearing is whether a child is neglected, and not whether each parent is neglectful; it is only after the trial court has adjudicated a minor neglected that the court is to consider the actions of the parents. In re Arthur H., 212 Ill. 2d at 466-67.

Here, the only remaining count of the neglect petition alleged that K.S.'s environment was injurious to her welfare because Valerie failed to protect her by failing to follow the safety plan of DCFS. Valerie stipulated to this allegation and the State's factual basis for the allegation. This evidence was unrebutted by respondent. Thus, the allegation of

neglect was proved by a preponderance of the evidence. Therefore, the finding of neglect is affirmed.

While the supreme court in Arthur H. did not reach the question of the scope of dispositional hearings in neglect or abuse cases due to the facts and circumstances there, the court did make clear that such cases "involve relationships touching on fundamental rights, and the natural ties between parents and their children may not be severed on the basis of mere speculation." Arthur H., 212 Ill. 2d at 477-78. Because of this, "the State must be held to its burden of proof." Arthur H., 212 Ill. 2d at 477. Therefore, respondent's next contention, that the trial court erred in ordering him to complete a sexual offender evaluation and follow the resulting recommendations, requires close scrutiny because the State presented no competent evidence against him and he was never given an opportunity to present evidence on his own behalf.

The conditions of a dispositional order must have some basis in the evidence. In re Chyna B., 331 Ill. App. 3d 591, 597-98 (2002). On review, a trial court's dispositional determination will be reversed only if the court's findings of fact are against the manifest weight of the evidence or if the court committed an abuse of discretion by selecting an inappropriate dispositional order. In re J.P., 331 Ill. App. 3d 220, 238 (2002).

The trial court twice ordered respondent to complete the evaluation--first, when the finding of neglect was made, and, second, as part of the dispositional order. In neither instance was the order supported by law or fact; therefore, we must reverse the trial court's dispositional order and remand the cause for a new dispositional hearing.

The court heard nothing except rank tertiary hearsay regarding the allegations of a sexual offense committed by respondent. At the time that the court found count IV to be

proved, it had heard nothing except what Valerie stipulated that DCFS caseworker Martinez would testify to if she were called to testify. In that stipulation, it was stated that Martinez would testify that she was involved in an investigation of the allegation that respondent molested T.V. and that DCFS's safety plan prohibited respondent's presence in Valerie's house. It was the violation of this safety plan that formed the basis of the court's finding of neglect. However, the court also heard that the criminal case against respondent, which arose from the same allegations of sexual molestation, was dismissed in January 2000, more than two years prior to the hearing, and count III of the petition, alleging abuse based on those same allegations, was dismissed just moments before.

In both instances, the complete lack of evidence against respondent leads us to conclude that the trial court's actions were both an abuse of discretion and against the manifest weight of the evidence. The Catholic Charities report generated for the dispositional hearing included the statement that the DCFS report regarding the molestation allegations was "indicated." However, respondent consistently denied the allegations, and the Catholic Charities report noted this fact.

The trial court never heard <u>any</u> direct evidence that respondent had committed any sexual offense. Valerie's stipulation that she violated the safety plan and the dispositional report stating that allegations of sexual molestation had been made were the only "evidence" that the court heard. The trial court even ordered the sexual offender evaluation based only on the stipulation, as the court ordered the evaluation before the dispositional report was even created. While the DCFS report was indicated, such a designation means only that the report of abuse or neglect was supported by "credible evidence." <u>Lyon v. Department of Children & Family Services</u>, 209 Ill. 2d 264, 267 (2004); see 325 ILCS 5/3

(West 2004).  On the other hand, the court knew that the State had dismissed the criminal charge against respondent and withdrawn the abuse allegations based on the  same alleged incident, and that respondent had always denied the allegations.  Reference to a DCFS report supported by "credible evidence" was  an insufficient basis for ordering respondent to undergo a sexual offender evaluation.

"Credible evidence" means that the available facts, viewed in light of the surrounding circumstances, would cause a reasonable person to believe that a child has been abused or neglected.  Lyon, 209 Ill. 2d at 267; see 89 Ill. Adm. Code §300.20, as amended by 29 Ill. Reg. 21065 (eff. December 8, 2005).  It does not require a fact finder to consider contrary evidence; thus, it places the risk of error entirely on the subject of a report.  Lyon, 209 Ill. 2d at 280-81.  Our supreme court has acknowledged the "strikingly high" (74.6%) rate of reversal of challenged indicated findings based on credible evidence.  See Lyon, 209 Ill. 2d at 281.  Labeling evidence as credible in no way denotes that the evidence comports with rules of evidence or procedural due process.  See Lyon, 209 Ill. 2d at 280 (regarding due process).  A finding by a DCFS worker, as capable as the worker may be, does not obviate the need for the State to produce evidence of alleged offenses and for a judge to find, by a standard more exacting than "credible," that an offense was committed.

The limited value of "credible evidence" was made manifest by our supreme court in Lyon, which dealt with an administrative appeal of an indicated finding of sexual abuse that was entered into the DCFS Central Register.  See 325 ILCS 5/1 et seq. (West 2000).  The plaintiff, a high school choral director, sought reversal of the indicated finding and expungement of the report from the register.  Our supreme court recognized that the plaintiff had protected due process rights implicated by his inclusion on the register--his

reputation and ability to pursue present and future employment were both implicated, as evidenced by the fact that he had lost two teaching jobs following entry of the report on the register.  See Lyon, 209 Ill. 2d at 273-74.  The court then analyzed the competing interests involved--a subject's significant interest in obtaining a hearing and a final decision in a prompt and efficient manner so that an indicated report, if mistaken, is expunged as quickly as possible, and the State's significant interest in protecting the welfare of children, with the register being one mechanism used to provide such protection.  See Lyon, 209 Ill. 2d at 278.  The court  concluded that it was appropriate to place more of the risk of error on the adult subject of a report than on children who may suffer additional abuse.  Lyon, 209 Ill. 2d at 279.  It was in this context of risk of error that the court analyzed the use of the credible evidence standard (used to support the initial indicated finding and the first stage of a subject's appeal) and the preponderance of the evidence standard (used later at the administrative hearing).

The court concluded that use of the "credible evidence" standard in an initial investigation and first-stage appeal does not automatically deprive a subject of due process, because the second-stage appeal is conducted under the more stringent "preponderance of the evidence" standard.  While the entire risk of error is initially placed on the subject, it remains so only for a finite period, and the appeal would be finally determined under a more stringent, risk-balancing standard.  See Lyon, 209 Ill. 2d at 282.  However, it is "constitutionally inappropriate to allow indicated reports based on credible evidence, with their damaging effects on subjects," to persist beyond the deadlines for completion of the administrative appeals process that are statutorily and administratively set.  Lyon, 209 Ill. 2d at 282.  Thus, the court ruled that the low, credible-evidence

standard, combined with delays in the administrative process of the plaintiff's appeal (which led to a decision being issued approximately 11 months after the report was indicated), violated the plaintiff's due process rights. Lyon, 209 Ill. 2d at 284.

In this case, the noxious cloud of "credible evidence" has now hovered over respondent for more than six years and was already more than two years old when the trial court ordered respondent to undergo the sexual offender evaluation. However, even in light of the age and low standard of the "evidence" before it, the trial court abdicated its role as fact finder, as is evidenced by its explanation to respondent of its dispositional order:

"The issue is not whether the criminal case was dismissed or not. I have no idea why it was dismissed. I have no doubt that it was. I don't even know if it was the same complaining witness. But the issue now is that one of the children says that you sexually molested her. That may not be true. All the more reason to follow through with this evaluation and see what they say." (Emphases added.)

The State attempted to bolster that explanation with the following argument:

"Arguably, in the instant matter, the trial court assumed that the Respondent was a sex offender who posed harm to K.S. because without a related evaluation, it had no other course of action consistent with the best interests of K.S." (Emphasis added.)

We note that if count III had not been withdrawn, an adjudicatory hearing would have been a proper and acceptable course of action to determine if respondent was a sex offender and posed a threat to K.S. Be that as it may, trial courts are to base decisions on evidence, not assumptions. The absence of evidence is not "[a]ll the more reason" to order a parent to submit to a sexual offender evaluation and possible counseling.

Respondent was never given a hearing at which witnesses testified, with the opportunity to cross-examine witnesses and present his own evidence. The State foreclosed this possibility when it dismissed the criminal charge and withdrew the abuse allegations against respondent in count III. Instead, the court ordered the evaluation without any evidence closer than old, minimally substantiated, third-hand reports, and it attempted to rely on the sexual offender evaluation to prove whether respondent was guilty of the alleged sexual offenses. In addition to the trial court's error in ordering the evaluation at all, we must point out the fallacy of the court's reasoning. We are unaware of any authority that has determined, pursuant to Frye, that such an evaluation may be so utilized. See Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). Completion of the evaluation would not establish whether respondent sexually molested T.V. Respondent denied the allegation. In the absence of an admission or stipulation by respondent, only an evidentiary hearing could determine whether respondent committed such an offense.

One can readily see the dilemma into which respondent has been placed. The State charged him criminally with a sexual offense, then withdrew the charge when respondent demanded trial. The State filed a neglect petition that alleged the same sexual offense, then withdrew the allegation before a hearing was held. Because Valerie stipulated to a tangentially related allegation, the uncorroborated, unproven allegations of sexual abuse were still in play for the disposition. Catholic Charities, while noting that respondent "has denied any responsibility for the sexual molestation report that was indicated by DCFS in 2000," also characterized respondent as "in denial about his responsibility" in the DCFS case. Apparently, respondent must take responsibility for actions that he denies ever occurred and that no one will take the responsibility of proving. Denying abuse is not the

equivalent of being in denial despite proof of abuse. In re Clarence T.B., 215 Ill. App. 3d 85, 104 (1991).

The law cannot allow a trial court to order such an evaluation based only upon uncharged, unsubstantiated, and unproved allegations that have been misconstrued as evidence. Furthermore, respondent demanded a hearing on the merits and an opportunity to confront witnesses but was denied that opportunity. We find error in this violation of the due process rights to confront witnesses and to require proof by at least a preponderance of the evidence, even though the violation was done to "protect children." If these rights can be sacrificed in such an instance, all other constitutional rights must also be subordinated.

The State further argues that a trial court "need not wait until the child is victimized or emotionally damaged" before removing the child from an injurious environment. While true, it does not mean that actions may be taken against a parent without giving him a hearing and an opportunity to respond to any unproven allegations of criminal behavior that would require rehabilitation. As this court noted in In re Baby Boy Butt, 76 Ill. App. 3d 587 (1979):

"We are dealing here with the future and only possibilities and probabilities can be assessed. To expose respondent's children to a reasonable probability of abuse is something this court will not do. On the other hand, no child in any family is free from the possibility of future abuse and we cannot afford to sever the natural ties between parent and child and cause that loss to both of them on the mere possibility that the child may be abused." (Emphasis in original.) In re Baby Boy Butt, 76 Ill. App. 3d at 594.

A case should be decided on the facts in evidence. See In re T.W., 313 Ill. App. 3d 890, 892 (2000). Here, given the total lack of established facts, there was no basis to warrant the order of a sexual offender evaluation. The State had the opportunity to prove these allegations of sexual molestation, either in a criminal trial, in an adjudicatory hearing, or at the dispositional hearing in question. It did none of these things. The court cannot presume these allegations to be proven without conducting a hearing, nor can it order respondent to prove that he is not a sexual offender, especially in light of the insubstantial "evidence" of a sexual offense that was presented to the court.

We cannot determine why the dissenting justice claims that a sexual offender evaluation will only involve investigators reviewing reports and reinterviewing witnesses "to try to uncover what happened here." Slip op. at 19. One with experience in court-ordered evaluations, whether they be for alcohol use in a driving-under-the-influence case or for sexual issues arising out of a sexual abuse case, knows that such an evaluation would be done to assess the subject's behavior, not the State's investigative techniques. It was respondent, not the State, who was required to undergo the evaluation; a possible result of the ordered evaluation would be respondent being required to undergo treatment, as the trial court specifically said, not the State having to write another report.

The trial court erred in ordering respondent, both before and as part of the dispositional order, to undergo the sexual offender evaluation. The dispositional order is reversed, and the cause is remanded for a new dispositional hearing.

Respondent also contends that the trial court erred by not returning K.S. to his custody. Because we have ordered a new dispositional hearing, the issue of K.S.'s placement must be addressed again in the trial court. However, in light of our analysis

above, we will address some concerns regarding the "proofs" from the prior hearing and the trial court's original order regarding placement.

Pursuant to section 2--22 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2--22 (West 2002)), once a minor has been adjudicated neglected, the trial court is to determine if it is in the best interests of the minor and the public that the minor be made a ward of the court. The court is then authorized to enter a dispositional order for the custody or placement of the minor. See 705 ILCS 405/2--23 (West 2002). Section 2--27 of the Act then provides in part:

"(1) If the court determines and puts in writing the factual basis supporting the determination of whether the parents, guardian, or legal custodian of a minor adjudged a ward of the court are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents, guardian or custodian, the court may at this hearing and at any later point:

* * *

(d) commit the minor to the Department of Children and Family Services for care and service ***." 705 ILCS 405/2--27(1)(d) (West 2002).

The requirement that the factual basis be in writing is a requirement, not a request. See In re Madison H., 347 Ill. App. 3d 1024, 1028 (2004).

The trial court in this case granted guardianship to DCFS in the absence of any written findings or factual basis concerning respondent's unfitness, inability, or unwillingness to care for, protect, train, or discipline his daughter. K.S. had been placed

under the temporary guardianship of DCFS at the shelter care hearing.  At that hearing, the court found probable cause to believe that K.S was neglected or abused, because of the possible suffocation of her sibling at the hands of her mother and the "[r]isk of harm" due to respondent "being indicated for risk of sexual abuse."  The court found immediate and urgent necessity to remove K.S. from the home and place her in a shelter care facility because her mother was in jail and respondent had a "prior indicated report of risk of sexual harm."  Reasonable efforts to keep K.S. in the home could not be made because her mother was in jail and respondent had "not availed himself to [sic] any sexual offender treatment and has [sic] prior indicated report."

The only allegations against respondent at the time of the shelter care hearing were the DCFS report and his failure to avail himself of sexual offender treatment arising out of an incident that he denied occurred and that the State declined to prosecute.  The State had the opportunity to make a showing that placement with a third party was appropriate in this case, through prosecution of either the criminal charge or the abuse allegation or through presentation of evidence at the dispositional hearing.  It did none of these.  The trial court granted continued guardianship to DCFS in the absence of any evidence other than old tertiary hearsay allegations that had never been proven.

The dissent inexplicably relates an improper and inaccurate discussion of and citation to this court's prior opinion in this case, which was vacated by our supreme court.  See slip op. at 16.  A vacated judgment is nullified, canceled, and void.  People v. Eidel, 319 Ill. App. 3d 496, 504 (2001).  There is nothing from which this majority can back down, as the entire prior opinion is a nullity.  What this court said in K.S., 343 Ill. App. 3d at 187, is now as relevant as what was said in draft opinions that were circulated but never published.

Further, in that cited material, this court referred to "the thought process" behind a specific quotation from the dissent, not the thought process behind the supreme court's decision in Arthur H. that, obviously, did not exist when our previous opinion was filed. Such a misleading use of a quotation is intolerable in an appellate court disposition.

The dissent further dissembles in its little discourse on "evaluation" versus "assessment" and the issues of counseling and treatment. See slip op. at 18 n.2. The term "assessment" was contained in the Catholic Charities report that was quoted only the sentence before our allegedly incorrect use of the term. Similarly, the references to "counseling" and "treatment" arose from direct quotes from respondent's attorney and the temporary custody order entered by the court, respectively. "You have eyes, and yet do you not see?" Mark, 8:18.

The interest of parents in the care, custody, and control of their children is one of the oldest of the fundamental liberty interests recognized, and this interest is protected by the due process clause. In re Kenneth F., 332 Ill. App. 3d 674, 680 (2002). A fit parent has a superior right to custody of his child that can be superceded only by a showing of good cause to place custody of the child in a third party. S.S., 313 Ill. App. 3d at 132. While the best interests of the child is the paramount consideration whenever a petition for adjudication of wardship is brought (see S.S., 313 Ill. App. 3d at 126), a trial court must render its judgment based on actual evidence and in conformity with statutory requirements. The trial court failed to do that in this case. The best interests of the child is not an isolated concept; it must be determined in the context of the evidence that is properly before the court. The best interests of the child may require the court to order the State to present evidence to prove an allegation, but it cannot require a parent to prove that

the allegation is false.       Section 2--10(2) of the Act prohibits the return of a minor in shelter care to a parent "until the court finds that such placement is no longer necessary for the protection of the minor." 705 ILCS 405/2--10(2) (West 2002). We must question how the trial court could ever make such a finding in this case if the State never attempts to prove the hearsay allegations of sexual abuse, since it was those allegations that were the basis for finding at the shelter care hearing that placement could not be made with respondent. The trial court placed on respondent the burden of proving that he was not a sex offender, apparently by undergoing a sex offender evaluation, instead of placing on the State the burden of proving, even by a preponderance of the evidence, that respondent posed a sexual threat to his daughter. "Credible evidence" may have been sufficient for the court to find that placement with respondent was not appropriate at the time of the shelter care hearing. However, such flimsy, unproven evidence cannot indefinitely be used to separate respondent and his child. Court-ordered interference in a parent-child relationship, based on such "evidence," is not in the child's best interests. The State has an obligation to plead and prove these allegations if it wants to rely on them as a basis for placing guardianship with someone other than respondent. Let there be no mistake--the burden must be on the State to present evidence in the first instance. Furthermore, if the State plans to use against a parent evidence of some conduct, the parent must be notified in some manner of the intended use. Without notice, a parent cannot prepare a meaningful response or defense. A dispositional hearing on a neglect petition is a vital stage in the process that can ultimately lead to termination of parental rights; therefore, it is important to the fairness of any future termination proceeding. In re Miracle C., 344 Ill. App. 3d 1046,

1056 (2003). A parent cannot be left to guess what avenues to pursue in order to protect this most fundamental right.

For these reasons, the judgment of the circuit court of Lake County is affirmed in part and reversed in part, and the cause is remanded.

Affirmed in part and reversed in part; cause remanded.

HUTCHINSON, J., concurs.

JUSTICE O'MALLEY, concurring in part and dissenting in part:

I agree with the majority on two points. First, as the majority has emphasized, it "cannot fathom the thought process" (K.S., 343 Ill. App. 3d at 187) that the supreme court adopted in Arthur H. subsequent to our first decision in this case. We have been ordered to reconsider this case in light of precisely that "unfathomable" thought process. For the reasons that follow, I agree with the majority's assessment of its abilities.

The second thing that the majority and I agree upon is that the child sex abuse allegations against respondent remain unresolved. The majority's point is that the allegations remain unresolved because the State withdrew the charge at the neglect phase. The question, then, is what to do about these unresolved sex abuse allegations. As explained below, the majority is strongly of the view that the State was obligated to pursue the sex abuse charge at the neglect phase, and the majority's original position was that the consequence of the State's failure to pursue the sex abuse charges at the neglect phase required an order from this court awarding custody of K.S. to the alleged child sex abuser. The majority did so order.

For unexplained reasons, the majority has backed down from that original position.[1] The current majority opinion does not award custody to respondent, but instead remands this cause to the trial court with directions that the trial court not conduct further investigation into "uncharged allegations," i.e., the child sex abuse allegations. It does so because it believes that "[t]he State had the opportunity to prove these allegations" (slip op. at 11) but instead "foreclosed this possibility when it dismissed the criminal charge and withdrew the abuse allegations against" respondent (slip op. at 10).

For reasons that I detail below, the majority is wrong. But assume for the moment that the majority is correct that the State was wrong to assume that it could withdraw the

---

[1] I say that the majority's backing down from awarding custody to respondent is "unexplained" because the supreme court ordered us to reconsider this case in light of Arthur H., and neither that order nor Arthur H. reached the issue of the propriety of this court ordering custody to respondent.

child sex abuse allegations at the neglect phase but those allegations would still be dealt with at the dispositional phase. Such an error by the State would be a procedural default. I am unable to fathom any system of laws that expressly recognizes that the best interest of the child is paramount yet would permit a child to be condemned to the custody of an alleged child sex abuser (before resolution of such allegations) as a consequence of a procedural default by the State. I am aware that procedural defaults can lead to severe consequences, but nothing like this. Not only would such a result be contrary to common sense and common decency, but if the phrase "the best interest of the child is paramount" means anything, it certainly means that it is paramount to a procedural default by the State. So, even under the majority's view of the law, the result it reaches (the trial court cannot investigate the child sex abuse allegations because they have been already withdrawn) is wrong.

I disagree with the majority's conclusion that the trial court improperly ordered a sex offender investigation, evaluation, or assessment[2] of respondent. In my view, at the dispositional phase the trial court needed to make a finding on respondent's fitness before it awarded guardianship to DCFS and placed K.S. in the custody of her grandmother. I would

_____

[2] Not only does the majority fail to state what it views an evaluation to be, but it also refers (sometimes by quoting the attorneys and trial court) to the action the trial court attempted to undertake as an "evaluation," (slip op. at 2), an "assessment" (slip op. at 3), "counseling" (slip op. at 4), and "treatment" (slip op. at 14). The majority's use of the words "counseling" and "treatment" are blatantly wrong, and even respondent has not claimed that he was ordered to undergo treatment or counseling.

remand to the trial court with the direction to address respondent's fitness. In doing so, as explained more fully below, I would direct the trial court to make full use of section 2--21(2) of the Act, and to consider respondent's cooperation (or lack thereof) in any investigation ordered pursuant to section 2--21(2). "Let there be no mistake" (slip op. at 16), the majority has placed the trial court and K.S. in a "dilemma" (slip op. at 10) by holding that the trial court was wrong to order a sex offender evaluation. The dilemma the majority has placed the trial court in comes about because the majority has barred the evaluation process without stating what an evaluation is. As I said in my dissent last time, all we know about the evaluation is what the trial court said about it:

"All the more reason to follow through with this evaluation and see what they say. They will be reviewing the reports. They will be reviewing the statement to see if there was a recantation, whatever the situation is."

Obviously, the trial court has to determine the validity of the sex abuse allegations. I do not know what the trial court is supposed to do on remand, because the majority does not say specifically what the trial court is prohibited from doing. As the above quote from the trial court indicates, "they" (presumably investigators) are going to review reports and reinterview witnesses to try to uncover what happened here. Can the trial court do that under the majority's ruling? Because the majority bans an evaluation without defining what that term entails, can the trial court do all that it described if it just uses a different label for what it is ordering? The majority surely cannot be directing the trial court not to have someone find out "whatever the situation is," but, on the other hand, the majority has stated that the evaluation cannot be based on "uncharged" allegations.

The majority laments (slip op. at 6), again (slip op. at 7), and again (slip op. at 10), and again (slip op. at 12), and again (slip op. at 14), and again (slip op. at 15) the lack of charges against respondent. Thus, the majority's fundamental position is that the possibility of a hearing regarding the sex abuse allegations was foreclosed when the State dismissed the criminal charge and withdrew the sex abuse allegations against respondent (see slip op. at 10), and, thus, if an evaluation and dispositional hearing were to go forward, respondent would be left with no way to contest any unfavorable findings "against him." This is flat out wrong, both legally and factually, and it contradicts the basic point of Arthur H. that the majority is, in its own words, unable to fathom. The majority's reliance on repetition rather than reasoned analysis is evidenced by its repeated observations regarding the withdrawal of certain charges and by the fact that the majority never responds to my discussion of how it fails to follow Arthur H.

The majority is seeing the neglect stage as setting limits on what will be considered during the dispositional stage, meaning that if an allegation was not proved as to respondent at the neglect stage, then it cannot form the basis for the trial court's orders at the dispositional stage. The majority states that "[t]he State foreclosed [the possibility of a hearing on the allegations] when it dismissed the criminal charge and withdrew the abuse allegations" (slip op. at 10), and the majority concludes from that that the substance of the withdrawn allegations cannot form a basis for determining whether respondent is fit to have custody. But Arthur H. and In re C.N., 196 Ill. 2d 181 (2001), make it clear that the fact that the charges against respondent were withdrawn or never brought at the time of the trial court's ruling at the neglect phase is of no consequence at the dispositional stage. The majority sees a need for a formal charging document as a basis for any orders or

investigations at the dispositional stage, such as would be the case in a criminal proceeding.

Though the majority complains of a lack of formal charges against respondent, it does not point to any statutory provision or case law indicating that the Act requires anything analogous to a criminal complaint making a formal charge against a respondent at the dispositional stage. Unlike charges in a criminal case, or the complaint in a typical civil case, the charges at the neglect stage do not shape everything that follows. In fact, the purpose of the neglect phase is quite different from that of the dispositional stage. After a child is found to be neglected, the proceeding moves to the dispositional stage, where the trial court is to determine what course of action is in the child's best interests (Arthur H., 212 Ill. 2d at 464), but not to determine the guilt or innocence of a respondent (In re R.B., 336 Ill. App. 3d 606, 614 (2003)). This determination of the child's best interests does not depend on any formal charges in the neglect petition. Quite specifically to the contrary, our supreme court has held that even if an issue was not alleged in the neglect petition, it can still be a basis for a service plan or dispositional order. C.N., 196 Ill. 2d at 214. The supreme court stated that "the relevant issues are not 'frozen' at the moment custody of the child is taken." C.N., 196 Ill. 2d at 213-14. Rather, the necessity of considering other conditions that "come to light only with further investigation" is reflected in the "broad scope" of the investigation that the trial court is authorized to order under section 2--21(2) of the Act (705 ILCS 405/2--21(2) (West 2000)), after an adjudication of neglect.[3] C.N., 196

_____

[3] Section 2--21(2) of the Act provides: "To assist the court in [deciding whether it is in the best interests of the minor to be made a ward of the court] and other determinations at

Ill. 2d at 214. Thus, "it makes no sense to so narrowly limit what the trial court can order a respondent parent to do following an adjudication of neglect, abuse, or dependency." In re C.S., 294 Ill. App. 3d 780, 789 (1998); see also Chyna B., 331 Ill. App. 3d at 597-98 ("the conditions of a dispositional order need not relate solely to the grounds for adjudication of wardship"). C.N. gives no indication that any of the matters investigated during the dispositional phase need a basis in the form of a formal charging document. In fact, the law is quite the opposite--it gives the trial court the power to order an investigation of "broad scope" into " 'any *** information that may be helpful to the court' " at the dispositional phase. C.N., 196 Ill. 2d at 214, quoting 705 ILCS 405/2--21(2) (West 1998). Adding a requirement, as the majority does, that any investigation at the dispositional stage must be tied to a formal charging document is utterly inconsistent with the Act and with supreme court precedent and would render meaningless the power to order an investigation of broad scope into any information that may be helpful to the court. However, the majority relies on exactly such a requirement in reaching its view that respondent is being deprived of his "right to custody" here (slip op. at 15), because the trial court ordered an investigation into an "uncharged" allegation (slip op. at 11). Such a view is flatly at odds with the holding of Arthur H. Notably, the majority does not even respond to any of this, let alone offer any

---

the dispositional hearing, the court may order that an investigation be conducted and a dispositional report be prepared concerning the minor's physical and mental history and condition, family situation and background, economic status, education, occupation, history of delinquency or criminality, personal habits, and any other information that may be helpful to the court." (Emphasis added.) 705 ILCS 405/2--21(2) (West 2000).

reasoned analysis. It simply repeats over and over that certain charges were withdrawn or dismissed.

As the trial court wisely and aptly observed:

"The issue is not whether the criminal case was dismissed or not. I have no idea why it was dismissed. *** I don't even know if it was the same complaining witness. But the issue now is that one of the children says that [respondent] sexually molested her. That may not be true. All the more reason to follow through with this evaluation and see what they say. They will be reviewing the reports. They will be reviewing the statement to see if there was a recantation, whatever the situation is. I don't know from what I can see here."

So, "charges or no charges," the question confronting the trial court was what to do with regard to the unresolved child sex abuse allegations. The trial court decided, again wisely in my view, to take the steps necessary to resolve those allegations before deciding whether the alleged child sex abuser should have custody of K.S.

As noted, the trial court had the discretionary power to order an investigation into the alleged sex abuse, under the "broad scope" (C.N., 196 Ill. 2d at 214) of its investigatory powers under section 2--21(2) of the Act (705 ILCS 405/2--21(2) (West 2000)). Given that there was evidence presented, hearsay or otherwise, that respondent committed a sex offense, it was not an abuse of discretion for the trial court to order further investigation before placing custody of K.S. with respondent. The majority misses the point when it states that "[t]he absence of evidence is not '[a]ll the more reason' to order a parent to submit to a sexual offender evaluation and possible counseling." Slip op. at 9-10. (Although the majority refers to sex abuse counseling in its opinion (slip op. at 10), the trial

court at no time ordered sex abuse counseling.)  Of course, it is paradoxical to require the trial court to have proof of sex abuse before it can order an investigation of sex abuse. Obviously, it makes no sense to make proof a prerequisite to ordering an investigation, the purpose of which is to determine whether there is proof.  The majority cites In re Baby Boy Butt, 76 Ill. App. 3d 587 (1979), for the premise that an order based on possible sex abuse is error.  Slip op. at 11.  Butt, however, dealt with the proof necessary to place a child in the guardianship of DCFS, not the amount of evidence necessary to order an investigation under section 2--21(2).  Butt, 76 Ill. App. 3d at 594.  There is a wide chasm between these two issues, and Butt is inapplicable.  The hearsay evidence that one of K.S.'s siblings and K.S.'s cousin accused respondent of sexually molesting them was enough to justify an investigation under section 2--21(2).  The real question is whether the sex offender evaluation fits within the "broad scope" (C.N., 196 Ill. 2d at 214) of the investigatory powers granted to the trial court under section 2--21(2).

The majority cites Lyon as authority for its conclusion that the trial court had no basis to order a sex offender evaluation, but Lyon is inapposite to the case at hand.  In Lyon, the plaintiff, an accused sex offender, sought to have his name expunged from a sex offender registry.  Lyon, 209 Ill. 2d at 268.  The supreme court concluded that the plaintiff had a liberty interest in not being named on the registry (Lyon, 209 Ill. 2d at 273-74), and it held that the credible evidence standard used to enter the plaintiff's name on the registry was too low a standard to protect his due process rights (Lyon, 209 Ill. 2d at 279-84). Obviously, the current case has nothing to do with any sex offender registry.  The majority opines about the fact that "[r]espondent was never given a hearing" to contest the allegations and about its belief that the trial court "attempted to rely on the sexual offender

evaluation to prove whether respondent was guilty." Slip op. at 10. Again, the question at the dispositional stage is not respondent's guilt or innocence, but instead K.S.'s best interests. The majority's extended discussion of "credible evidence" demonstrates that it continues to labor under its misapprehension that the State must allege and prove allegations in order to allow the trial court to conduct an investigation. The discussion also belies the majority's assertion, upon which it bases its opinion, that there was a "complete lack of evidence against respondent" (slip op. at 6).

Notwithstanding the majority's non sequitur recapitulation of the Lyon credible evidence discussion, the legislature has precisely detailed what is to happen in a case where allegations of child sex abuse have been made, there is credible evidence regarding the allegations, and the child has been found to be neglected or abused:

"Once the court finds that it is a matter of immediate and urgent necessity for the protection of the minor that the minor be placed in a shelter care facility, the minor shall not be returned to the parent, custodian or guardian until the court finds that such placement is no longer necessary for the protection of the minor." (Emphasis added.) 705 ILCS 405/2--10(2) (West 2000).

As the logic underlying Arthur H. makes clear, an adjudication of neglect is specific not to each parent, but to each neglected minor. Accordingly, once the trial court adjudicated K.S. neglected, and once it found an immediate and urgent necessity to place her in shelter care based on that neglect, custody of K.S. could not be given to respondent until the trial court found that shelter care placement was no longer necessary for her protection. The trial court's attempts to investigate the sexual abuse allegations against respondent are consistent with the above legislative mandate. The majority's

pronouncements regarding respondent's right to custody and the State's "burden" to "present evidence in the first instance" (slip op. at 16), however, are completely inconsistent with this legislative mandate and instead reflect the majority's misapprehension regarding the need for "charges" against respondent.

The majority responds to the requirement that K.S. not be placed with respondent until the trial court finds that doing so is safe, by wondering "how the trial court could ever make such a finding *** if the State never attempts to prove the *** allegations." Slip op. at 15. Thus, the majority believes that the State's dropping both the criminal charge against respondent and the neglect count based on the same event,[4] combined with the trial court's obeying the Act in trying to investigate the allegations against respondent, place respondent in a "readily see[n]" "dilemma" wherein "respondent must take responsibility for actions that he denies ever occurred and no one will take the responsibility of proving." Slip op. at 10. On the contrary, what is readily seen is that, as the majority proclaimed in its original opinion in this case, it remains unable to fathom the process that the supreme court and the legislature have set forth for these matters. Specifically, the majority does not understand the relationship between the adjudication of neglect and the proceedings that

---

[4] I note that, obviously, once the State had obtained the stipulation as to neglect on one of the counts, it was completely unnecessary for it to pursue any of the other counts of neglect, because neglect is adjudicated as to each minor and not as to each parent. Thus, it stands to reason that the State, assuming that the trial court could explore any abuse allegations during the dispositional stage, dropped the remaining counts in its neglect petition once it obtained Valerie's stipulation of neglect.

follow it. Again, the State need not have pursued any charges related to the sex abuse allegations in order for them to be relevant at the dispositional hearing. The purpose of the dispositional hearing is not to determine respondent's guilt, but to ensure K.S.'s safe placement. The trial court is duty-bound to investigate the charges against respondent, whether he denies them or not, and whether the State prosecutes them or not. Even if the State sought to abandon the sex abuse allegations, under section 2--21(2) of the Act, the trial court has the "broad" (C.N., 196 Ill. 2d at 214) authority to order an investigation into "any *** information that may be helpful to the court." 705 ILCS 405/2--21(2) (West 2000). It must employ its authority to investigate, because a child removed to shelter care can be returned to his or her parents only after "the court finds that such placement is no longer necessary for the protection of the minor" (705 ILCS 405/2--10(2) (West 2002)). The only "dilemma" here is the one the majority places the trial court and K.S. in by preempting an evaluation without even knowing what the evaluation would entail.

Moreover, the foregoing answers the majority's question of how the trial court could make a finding pursuant to section 2--21(2) that it is safe (or not) to place custody with respondent. But the majority's rhetoric highlights the shortcomings of its reasoning. The majority does not dispute that section 2--21(2) requires a specific finding that "placement is no longer necessary for the safety of the minor." I find it extraordinary that the majority sees fit to disregard such a specific statutory mandate, not by a reasoned analysis of the statute's constitutionality, but instead by claiming that respondent has been placed in a "dilemma." Once again, the majority uses rhetoric and hyperbole rather than thoughtful analysis. But it is not any court's prerogative to express disdain for a statute by using phrases such as "dilemma" and then simply refuse to follow it. Claiming that respondent

has been placed in a "dilemma" is hardly a substitute for an analysis of a statute's constitutionality.

On the point of the evaluation itself, the majority states that "[c]ompletion of the evaluation would not establish whether respondent sexually molested T.V." Slip op. at 10. I do not understand how the majority is so sure what the evaluation would or would not establish. Again, the majority never states what it envisions the evaluation would entail--it simply holds that an evaluation cannot be done. When the majority bars the trial court from conducting an evaluation, it essentially tells the trial court not to find out what has happened in this case and not to find out if there are credible recantations. The barrier to the determination of the truth of the allegations against respondent, then, is not the State or the trial court, but the majority. The majority's assertions regarding respondent's rights, and its dramatic averment that allowing an evaluation would cause "all other constitutional rights [to be] subordinated" (slip op. at 11), completely miss the mark. It is not unreasonable that respondent should be asked to participate in the investigation, given the unique nature of juvenile proceedings.

Instead of discussing what it envisions the evaluation would entail and whether that evaluation fits within the "broad scope" of the trial court's section 2--21(2) investigatory powers, the majority quotes the trial court's explanation, chiding it by emphasizing each of the trial court's acknowledgments of what it did not know. See slip op. at 9. These acknowledgments were hardly abdications; they were exactly the sorts of things the Act contemplates will be investigated pursuant to section 2--21(2). The trial court never said that it intended to automatically adopt the report generated by the evaluation process or that respondent would be prohibited from challenging it at the dispositional hearing. The

majority's charge that the trial court "attempted to rely on the sexual offender evaluation to prove whether respondent was guilty of the claimed sexual offenses" (slip op. at 10) is unfounded and contradicted by the trial court's pronouncements, wherein the trial court clearly indicated that it would not form a conclusion as to the veracity of the allegations until it heard all the relevant evidence at the dispositional hearing. The dispositional report and the sex offender evaluation were to assist the court at the dispositional hearing. It is offensive to accuse the trial court of abdicating its role when it orders proceedings authorized by the Act to assist it, just as it is inaccurate to imply that the trial court denied respondent any demand for a hearing (see slip op. at 11 ("respondent demanded a hearing on the merits *** but was denied that opportunity")). The trial court attempted to conduct a hearing, but respondent chose to appeal the trial court's order instead of comply with it.

Regarding what I view as the basis for the trial court's investigation into the sex abuse allegations against respondent, the majority characterizes the DCFS report and the allegations against respondent as "rank tertiary hearsay" (slip op. at 6) and "old, minimally substantiated *** reports" (slip op. at 10). The majority's statements are perplexing. Use of hearsay evidence is specifically authorized by the Act. 705 ILCS 405/2--18(4)(c), 2--22(1) (West 2000). Whether or not the hearsay evidence was "tertiary" misses the point. Respondent does not question that the two children accused him of sex abuse but, rather, maintains that the children lied. Thus, the factual content of the Catholic Charities report, i.e., whether or not the two children said that respondent sexually abused them, was never at issue. The record shows that the DCFS report, on which the Catholic Charities report was based, was distributed to the parties. In this case, there was no functional difference between "tertiary" hearsay and simple hearsay, and the Act specifically authorizes

consideration of hearsay without limitation on the basis of it being "tertiary." 705 ILCS 405/2--18(4)(c), 2--22(1) (West 2000).

The majority's assertion that the use of hearsay evidence precludes respondent from challenging the truth of the charges against him (see slip op. at 10) is a monumental overstatement. It is true that use of hearsay evidence prevents respondent's cross-examination of the witness. However, this handicap is compensated for by the fact that the hearsay evidence is accorded lesser weight. 705 ILCS 405/2--18(4)(c) (West 2000). Although respondent did not avail himself of this opportunity,[5] the hearsay evidence did not prevent him from putting on a defense at the hearing and attempting to discredit both accuser and accusation. Importantly, the stipulated testimony and the hearsay evidence are not being used to force respondent to undergo sex offender treatment or, for that matter, as a basis for an unfitness finding under section 2--27. They are being used as a basis to find more information pursuant to section 2--21(2). In my view, this purpose is properly commensurate with the lower weight accorded to hearsay evidence. Once again the majority expresses its disdain for the law, but what is the majority holding? The majority does not state that it has found section 2--18(4)(c) unconstitutional. Once again, it is not any court's prerogative to express displeasure with a legislative enactment and then disregard it without any other basis for doing so.

---

[5] As the State points out in its brief, respondent "did not object to the presentation of evidence [as it was presented in this case], did not demand an opportunity to cross-examine any witnesses, nor did he object when the trial judge indicated there would be no direct evidence presented because the adjudication of neglect was being stipulated to."

The majority's statement that the trial court "attempted to rely on the sex offender evaluation to prove whether respondent was guilty" (slip op. at 10) is but one of the many statements the majority recites that make it sound as if the proceedings below were outrageous. However, further examination reveals that all of the following statements are simply hyperbole:

"A finding by a DCFS worker *** does not obviate the need for the State to produce evidence of alleged offenses and for a judge to find *** that an offense was committed." Slip op. at 7. Again, this is not a criminal case, and K.S. has already been adjudicated neglected.

"[T]he court ordered the evaluation before the dispositional report was even created." Slip op. at 7. Of course it did. The purpose of the evaluation was to help the trial judge determine what dispositional order would be in K.S.'s best interests.

"[T]he complete lack of evidence against respondent leads us to conclude that the trial court's actions were [improper]." Slip op. at 6. The majority's assertion of a "complete lack of evidence" is belied by its extended discussion regarding the "limited value" (slip op. at 8) of the "credible evidence" against respondent. Evidence cannot be both weak and nonexistent.

"We are unaware of any authority that has determined, pursuant to Frye, that such an evaluation may be so utilized." Slip op. at 10. The trial court did not say that the evaluation would be so utilized and no party has raised Frye or adduced evidence about the scientific standing of a sex offender evaluation. In fact, we do not even know what exactly the evaluation will entail. Thus, there is no basis for this statement.

"[R]espondent demanded a hearing on the merits and an opportunity to confront witnesses but was denied that opportunity" (slip op. at 11), and "[i]f these [due process rights to confront witnesses] can be sacrificed in such an instance, all other constitutional rights must also be subordinated" (slip op. at 11). At the adjudicatory hearing, respondent did not object to the presentation of witnesses, did not demand an opportunity to cross-examine any witnesses, and indicated no objections to the stipulated neglect finding. I propose to remand to the trial court so that the trial court can conduct a hearing to determine respondent's fitness to care for K.S., and respondent will be allowed to fully participate in that hearing.

"Here, given the total lack of established facts [before the court], there was no basis to warrant the order of a sexual offender evaluation. The State had the opportunity to prove these allegations ***, either in a criminal trial, in an adjudicatory hearing, or at the dispositional hearing in question. It did none of these things." Slip op. at 11-12. Again, no charges were necessary here, and the purpose of the dispositional hearing was to protect K.S.'s best interests, not to prosecute respondent.

"The court cannot presume these allegations to be proven without conducting a hearing ***." Slip op. at 12. Nothing like that happened. In fact, the court expressly stated it did not know whether the allegations were true and ordered an investigation to be done before the dispositional hearing.

"[The trial court cannot] order respondent to prove that he is not a sexual offender ***" (emphasis in original) (slip op. at 12) and "[t]he trial court placed on respondent the burden of proving that he was not a sex offender" (emphasis in original) (slip op. at 15). It would have been as outrageous as it sounds if the trial court had done

either of these things.  It did neither.  It is equally outrageous to falsely accuse the trial court of such conduct.

"[T]he State never attempt[ed] to prove the hearsay allegations of sexual abuse ***."  Slip  op. at 15.  That was the precise purpose of the investigation the trial court ordered.

"A parent cannot be left to guess what avenues to pursue in order to protect [his right to custody]."  Slip op. at 16.  Notice has never been an issue in this case.

The  above  misstatements,  though,  comprise  only  a  portion  of  the  majority's histrionics.  In  my dissent from the majority's original opinion, I pointed out that the decision was an "enthusiastic" (K.S., 343 Ill. App. 3d at 189 (O'Malley, J., dissenting)) repudiation of the best interests of the child standard.  See, e.g., K.S. 343 Ill. App. 3d at 184 ("The Star Chamber, inter alia, placed a premium on compelling subjects of investigation to admit guilt from their own lips").  Once again, the majority repudiates K.S.'s best interests with great enthusiasm and panache.  See slip op. at 9 ("noxious cloud of 'credible evidence' "); slip op. at 9 ("the trial court abdicated its role as fact finder"); slip op. at 10 ("old, minimally substantiated, third-hand reports"); slip op. at 10 ("[o]ne can readily see the dilemma into which respondent has been placed"); slip op. at 11 ("[t]he law cannot allow a trial court to order such an evaluation based only upon uncharged, unsubstantiated, and unproved allegations that have been misconstrued as evidence"); slip op. at 11 ("[i]f these rights can be sacrificed *** all other constitutional rights must also be subordinated"); slip op. at 16 ("[l]et there be no mistake").

Aside from the above-mentioned misapprehensions, misstatements, and histrionics, the  majority,  as  noted  above,  relies  also  on  repetition  and  emphasis  rather  than  on

reasoned analysis. For example, the majority repeats several times that the sex abuse charges against respondent were withdrawn or unproven, but it never responds to my observation that the neglect phase does not frame the issues to follow as would a charging instrument in a criminal case or a complaint in a civil case.[6] Instead of engaging in analysis regarding the function of the neglect phase, the majority simply repeats again and again, and again, that the sex abuse count was withdrawn at the neglect phase. I give above

---

[6] The closest the majority comes to addressing my observation is at the conclusion of its opinion, where it states that "[a] dispositional hearing on a neglect petition is a vital stage in the process." Slip op. at 16. However, the majority couches this proclamation within a paragraph that assumes that the negligence adjudication should serve as notice to the parent of the issues to be addressed in a dispositional hearing. Thus the majority simply perpetuates in its error.

another example of the majority's use of emphasis in the place of reasoning, where I quote the majority's quoting the trial court and emphasizing every instance in which the trial judge used a phrase such as "I have no idea" or "I don't know."  However, aside from using emphasis to try to take the trial court's statements out of context, the majority offers no reasoned analysis to explain why the trial court was in error.

The majority also quotes the State's brief as saying that, " '[a]rguably ***, the trial court assumed that the Respondent was a sex offender *** because without a related evaluation, it had no other course of action consistent with the best interests of K.S." (Emphasis in original.)  Slip op. at 9.  The majority once again emphasizes part of a statement, but the context of the State's statement leaves no doubt that the State was simply making the rather obvious point that, if the trial court orders a sex offender evaluation to protect K.S. and respondent refuses to comply, the trial court is left with no option to protect K.S. other than to disallow respondent custody.  Actually, the trial court's lack of recourse is grounded not on any assumption, but on the uncontroverted fact that respondent refused to comply with the trial court's order, i.e. to participate in the evaluation.  Just as with the child safety plan, respondent cannot unilaterally disregard the trial court's orders without consequence.  Of course, he can and did appeal this issue.

The majority notes that "the noxious cloud of 'credible evidence' has now hovered over respondent for more than six years."  Slip op. at 9.  I agree that the passage of time in this case, and in any case involving child custody, is a matter of great concern, but, obviously, a huge percentage of the delay in this case is a result of the majority's original mistake the first time the case was before us, requiring supreme court review.  Now, on remand, the majority is getting it wrong again, thus requiring yet another review by the

supreme court.  Moreover, the majority's statement regarding the fate of <u>respondent</u> is telling of its view of what our approach should be here.  As I observed above, this is not a criminal proceeding against respondent, and, under the applicable law, what is tragic here is that, for the same six years, the fate of K.S. has hung in the balance while the system has failed to make a final determination of child custody.

The current procedural posture of this case presents a significant issue.  The trial court entered a dispositional order that gave guardianship of K.S. to DCFS and placed her in the custody of her maternal grandmother.  Section 2--27, however, requires that before the trial court may take such action, it must make a determination that "the parents, guardian, or legal custodian of [the] minor adjudged a ward of the court are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents, guardian or custodian."  705 ILCS 2--27(1) (West 2000).  The trial court made no such finding.

The matter should be remanded so that the trial court can conduct a hearing to determine respondent's fitness and ability to care for K.S.  The trial court should have available the reports generated as a result of any evaluations or investigations conducted pursuant to section 2--21(2).  Obviously respondent may participate in such a hearing.  Consequently, the majority is wrong when it defends its position by complaining that, otherwise, actions will be taken against respondent without a hearing and the opportunity to respond to the allegations.