2021 IL App (2d) 210114-U
No. 2-21-0114
Order filed June 28, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* P.S., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | |
| | ) | |
| | ) | No. 20-JA-397 |
| | ) | |
| (The People of the State of Illinois, Petitioner- | ) | Honorable |
| Appellee, v. Danielle O., Respondent- | ) | Mary Linn Green, |
| Appellant). | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Bridges and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1    *Held*: Respondent-mother waived her claim of error regarding the introduction of documentary evidence at the adjudicatory hearing. The circuit court erred in finding the minor neglected due to not receiving proper or necessary support but did not err in finding the minor neglected based on an injurious environment.

¶ 2    Respondent-mother, Danielle O., appeals from the judgment of the circuit court that found her two-year-old son, P.S., neglected under sections 2-3(1)(a) and 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(a), (b) (West 2018)), due to not receiving the proper or necessary support necessary for his well-being and an environment injurious to his welfare. On appeal, respondent argues that the court relied on rank tertiary hearsay in rendering its decision

and that the evidence introduced at the adjudication hearing was insufficient to prove that P.S. was neglected. We determine that (1) respondent waived any argument regarding the State's evidence and (2) the improper support allegation was against the manifest weight of the evidence but that the injurious environment allegation was not against the manifest weight of the evidence.

¶ 3                                    I. BACKGROUND

¶ 4      On September 30, 2020, following four indicated reports for substantial risk of physical harm, inadequate supervision, injurious environment, and cuts due to neglect over the course of four months, the Department of Children and Family Services (DCFS) took protective custody of P.S. According to DCFS's statement of facts submitted to the court, although the family had prior contact with DCFS, the instant case began in May 2020, when respondent called police, stating P.S.'s father, Marvin (who is not a party to this appeal) left P.S. alone in a house surrounded by drug paraphernalia. According to a DCFS investigator's testimony at the shelter care hearing, respondent told police she made up the story because she needed help and services for P.S. and thought she needed to request help in that manner. The investigator also testified that respondent was arrested for making a false police report and that DCFS investigated the situation. The investigation concluded that respondent had inadequately supervised P.S. The police report, subsequent charging documents, and indicated packet from the May 2020 incident are not in the record.

¶ 5      A month later, respondent and Marvin were involved in a domestic dispute. Marvin contacted the police, stating that respondent hit him several times while P.S. was in the same room. Respondent left the home before the police arrived and was later arrested and charged with three Class A misdemeanors: domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2018)), interfering with the reporting of domestic violence (*id.* § 12-3.5), and criminal damage to property (*id.* § 21-

1(a)(1)). Shortly thereafter, both respondent and Marvin filed petitions for emergency orders of protection against one another. As a result of the dispute, DCFS was contacted, and an investigation indicated that there was substantial risk of physical injury to P.S. and that his environment was injurious to his health and welfare by neglect.

¶ 6    At the end of July 2020, respondent took P.S. from Rockford and sought help from a domestic violence shelter in Joliet. During the shelter's intake process, respondent reported that she and P.S. had not been eating, and a "community professional" observed P.S. was only wearing a diaper. Respondent reported that his clothes and shoes were in her car. The community professional noted that P.S. had cuts on his feet and that respondent had no explanation as to how he sustained those injuries. Finally, the community professional had to stop P.S. from inserting a key into an electric outlet. Because of the ongoing COVID-19 pandemic, respondent and P.S. were placed in a local hotel.

¶ 7    Two days later, the community professional went to check on respondent and witnessed P.S. unsecured in a stroller while respondent was outside "socializing." P.S. later fell out of the stroller and "cracked his head" on the concrete below. Respondent called emergency services and P.S. was treated at the scene. As a result, the community professional made a hotline call, and an investigation was conducted. The report indicated that there was substantial risk of physical injury, as well as environment injurious to P.S.'s health and welfare by neglect, and cuts, bruises, welts, abrasions, and oral injuries by neglect.

¶ 8    In early August, a community professional (the record is unclear as to whether it is the same community professional as the previous incident) went to check on respondent and discovered that respondent had requested that the sheets in her room be changed three out of the four nights she stayed there because P.S. had "saturated" the sheets with urine and that respondent

had requested ice for P.S.'s finger after they were pinched in the hotel room's door. As the community professional was driving out of the parking lot, P.S. ran out in front of her car. Respondent retrieved P.S. from the parking lot. As a result of a hotline call following that check-in, an investigation was conducted, which resulted in a report indicating respondent had inadequately supervised P.S.

¶ 9 Sometime thereafter, respondent and P.S. returned to the family home in Rockford. On September 29, an investigator attempted to contact respondent in person at the family home. The investigator knocked on the door and heard voices inside. After no one answered, the investigator and her supervisor decided that DCFS should take emergency protective custody of P.S.

¶ 10 The circuit court held a shelter care hearing on October 8, wherein the State's evidence, including the testimony of the investigator, generally followed the above facts. In rebuttal, respondent produced a witness who testified that she knew respondent a little over a year and observed her interactions with P.S. Respondent's witness testified that respondent typically exercised normal care and control of P.S. but also admitted that she was not present during any of the incidents noted above. The court found urgent and immediate necessity that P.S. be placed in the temporary guardianship of DCFS.

¶ 11 Pertinent here, the State filed what it called its "second amended" three-count neglect petition on October 19. (We note that in each of the four neglect petitions it filed, the State failed to accurately identify P.S.'s age.) Count I of the "second amended" petition alleged that P.S. was neglected because Marvin had a substance abuse issue, thereby placing P.S. at risk of harm, pursuant to section 2-3(1)(b) of the Act. Count II alleged P.S. was neglected because he was left unsupervised on multiple occasions, therefore P.S. was not receiving the proper or necessary support or care necessary for his well-being, pursuant to section 2-3(1)(a) of the Act. Count III

alleged P.S. was neglected because there was domestic violence in the home, thereby placing P.S. at risk of harm, pursuant to section 2-3(1)(b). The State later dismissed count I.

¶ 12 At the adjudication hearing, the State entered into evidence, without objection, seven exhibits: (1) the verified complaint in 20-CM-1427, from the June 2020 domestic violence incident between respondent and Marvin; (2) Marvin's verified petition for an emergency order of protection against respondent; (3) respondent's verified petition for an emergency order of protection against Marvin; (4) an indicated packet from April 2019, wherein the report found substantial risk of physical injury due to respondent and Marvin's domestic violence; (5) the indicated packet from the June 2020 domestic violence incident; (6) the indicated packet from the July 2020 stroller incident; and (7) the August 2020 incident where P.S. ran in front of a car. The State did not elicit testimony from any witnesses.

¶ 13 Respondent was the only witness to testify at the adjudication hearing. She testified that she "always" ensures that her son is in clean diapers, that P.S. did not run in front of a car, and that she "always" supervises her son. Respondent denied that P.S. ever tried to stick keys into an electric outlet. Respondent testified that P.S. was able to unbuckle himself from the stroller and fell out before she could reach him. She "begged" the paramedics to take him to the hospital, but they decided he was alert enough not to go. Respondent testified that she feeds P.S. a healthy, nutritious diet and that she has appropriately sized clothes and shoes for him. Respondent testified that she has "never" left her son unattended and keeps a close watch over him, even while smoking. Respondent then introduced into evidence nine photos of food, clothes, toys, and diapers that she has for P.S., ranging from before he was born to the recent visits she had with him since he has been in the care and custody of DCFS.

¶ 14    After hearing argument, the circuit court found that the State met its burden that P.S. was neglected as to both count II and count III. With respect to count II, the court found,

> "According to the documentary evidence, and specifically the indicated packets, the testimony and also the documentary evidence indicated that while staying in a shelter, the mother asked to have the bed sheets completely changed three out of four days which made the staff there believe that since they were soaked through that the child either wasn't wearing a diaper or wasn't getting them changed sufficiently. Further, when the worker was leaving the facility after seeing mother and the minor, the mother was supervising the minor, and the minor ran right in front of this worker's car, which if the worker had not seen him would have run over him.
>
> ***
>
> [T]he minor fell out of a stroller and hit his head on the forehead because he was not properly strapped in, and the mother was in the vicinity, but she couldn't prevent him from falling out and hitting his head. The mother was indicated for inadequate supervision when the minor was playing with the hotel doors and pinched his finger. The mother was present but not adequately supervising."

With respect to count III, the court found:

> "there were multiple reports of domestic violence between the parents. There have been self-reported incidents of domestic violence. There is a past order of protection and a present order of protection involving them. On June 10, 2020, a domestic incident involving the mother and the father in the presence of the minor resulted at least in a lump on the father's forehead. On or about March 4 of 2019, the mother stated that the scratches

on her arm were from the father. The father's tox[icology] results were positive for alcohol and THC, and both parents were indicated for inadequate supervision." The court then concluded that "[t]his being the adjudication, I think certainly that amounts to a great amount of evidence."

¶ 15    Following a conference off the record, the parties agreed to, and the circuit court entered, an order of disposition that found respondent unfit or unable, but not unwilling, to care for, protect, train, or discipline P.S., and made the DCFS his legal guardian.

¶ 16    This appeal timely followed.

¶ 17                                II. ANALYSIS

¶ 18    Respondent contends that the circuit court erred in finding P.S. neglected based upon not receiving the proper or necessary support or care necessary for his well-being and an injurious environment. Respondent argues that the court relied on "rank tertiary hearsay" in rendering its decision and that the evidence introduced at the adjudication hearing was insufficient to prove that P.S. was neglected. We address respondent's arguments in turn.

¶ 19    In making her first argument, respondent asserts that the exhibits that the State introduced into evidence contained "nothing more than third-hand 'reports' by unidentified 'reporters' who never testified" at the hearing. Although she recognizes that the documents themselves were admissible (pursuant to section 2-18(4)(b) of the Act), respondent takes issue with the circuit court's reliance on these documents and the lack of live-witness testimony. Respondent argues that the State did not introduce any "direct evidence" that the court could rely on to find P.S. neglected. Respondent relies heavily on *In re K.S.*, 365 Ill. App. 3d 566, 571 (2006), for the proposition that hearsay evidence alone is insufficient to establish neglect by a preponderance of the evidence. (We note that respondent cites to a vacated order, *In re K.S.*, 343 Ill. App. 3d 177, 180-81 (2003), for

this proposition. We will cite to the published opinion for accuracy and urge respondent's counsel to Shepardize or KeyCite future briefs before submitting them to this—or any—court.) Thus, respondent requests that we dismiss the second amended petition with prejudice.

¶ 20    In turn, the State initially argues that respondent has forfeited the claim of error as she did not object to the offending documents' admission at the hearing. Thus, the State argues, she has "forfeited" the right to an argument on appeal. The State also argues that the documents it introduced into evidence were actual evidence admissible by the Act and evidentiary rules and that *In re K.S.* is distinguishable from the case at bar. We agree with the State.

¶ 21    In order to preserve a claim of error involving the State's exhibits for review on appeal, respondent's trial counsel must have raised an objection during the adjudicatory hearing. See *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 52 (holding respondent-father waived any argument on appeal as to the admissibility of his medical records that were not properly certified when his trial counsel did not object to their admission during the adjudicatory hearing). Here, respondent's trial counsel stated he had "no objection" to the introduction of the State's exhibits. We note that such an objection would have likely been overruled, as the Rules of Evidence allow for certified records to be admitted into evidence (Exhibits 1-3) and the Act allows for the introduction of indicated reports (Exhibits 4-7) to be admitted into evidence. Ill. R. Evid. 902(4) (eff. Sept. 28, 2018); 705 ILCS 405/2-18(4)(b) (West 2018). *C.f. In re G.V.*, 2018 IL App (3d) 180272, ¶¶ 30-32 (holding the admission of an investigatory report as an indicated report did not comply with section 2-18(4)(b) of the Act and contained inadmissible hearsay as the investigatory report was compiled from an investigation in another state, without verification that information in the report was based on anyone's personal knowledge). Therefore, respondent waived any argument as to the State's evidence.

¶ 22    Even if we were to consider respondent's argument, *In re K.S.* is readily distinguishable from the case at hand. There, the minor was adjudicated neglected after the mother stipulated that she did not follow a safety plan that DCFS had created for the family, and the trial court ordered respondent-father to complete a sex offender evaluation. 365 Ill. App. 3d at 571. This court held that it was a violation of the respondent-father's due process rights for the trial court to order that he undergo a sex offender evaluation when the State presented nothing but "rank tertiary hearsay" against him and when he was never given an opportunity to present evidence on his own behalf. *Id.* The only "evidence" the court heard on the matter was the mother's stipulation and a dispositional report that an allegation of sexual molestation had been made. *Id.* Because the State did not produce any direct evidence that would support making the minor a ward of the State, we reversed the court's order of disposition and remanded it for a new hearing. *Id.* at 575.

¶ 23    Here, in stark contrast to the respondent-father in *In re K.S.*, respondent did not stipulate to an adjudication of neglect and was able to introduce her own evidence and testify as to the allegations of neglect. That the circuit court did not believe her testimony over that of the State's evidence is a different matter entirely, as addressed below. We are unconvinced the circuit court erred in relying on the State's exhibits in finding P.S. neglected.

¶ 24    We turn now to respondent's second argument, that the State did not produce sufficient evidence to establish P.S. was neglected as alleged in count II (improper support) and count III (injurious environment) of the second amended petition. Respondent argues that her sworn testimony rebutted the State's documentary evidence on both counts and that the circuit court's decision was based on "nothing more" than "the summation of four findings of 'credible evidence' " of allegations that were not severe enough to remove P.S. from her care. While we

agree that the State failed to meet its burden with respect to count II, we disagree that it failed to establish sufficient evidence to prove count III.

¶ 25    Because of the fact-driven nature of neglect and injurious environment rulings, "cases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). It is the State's burden to prove neglect allegations by a preponderance of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 17. "In other words, the State must establish that the allegations of neglect are more probably true than not." *Id.* If the State fails to prove the allegations of neglect by a preponderance of the evidence, the court must dismiss the petition. *In re N.B.*, 191 Ill. 2d 338, 343 (2000). On review, a circuit court's adjudication of neglect will not be reversed unless it is against the manifest weight of the evidence, meaning that only the opposite conclusion is clearly evident. *Arthur H.*, 212 Ill. 2d at 464.

¶ 26    The Act provides a two-step procedure that a circuit court must employ in determining whether a minor should be removed from his parents' custody and made a ward of the court. *In re A.W.*, 231 Ill. 2d 241, 254 (2008). The court initially conducts an adjudicatory hearing on the petition for adjudication of wardship, wherein "the court shall *** consider only the question [of] whether the minor is *** neglected ***." 705 ILCS 405/2-18(1) (West 2018). If the court concludes that the minor is neglected, then it proceeds to hold a dispositional hearing, wherein the court determines "whether it is consistent with the health, safety and best interests of the minor and the public that he be made a ward of the court." *Id.* § 2-21(2). The dispositional order is a final and appealable order and the proper vehicle to appeal an adjudication of neglect. *In re S.P.*, 2019 IL App (3d) 180476, ¶ 47.

¶ 27　Under the Act, a neglected minor includes "any minor under 18 years of age whose environment is injurious to his or her welfare." *Id.* § 2-3(1)(b). Neglect is generally defined as the failure to exercise the care that circumstances justly demand, although it is not limited to such a narrow definition. *A.P.*, 2012 IL 113875, ¶ 22. "[N]eglect encompasses 'wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes.' [Citations.]" *Id.* Similarly, "injurious environment" has been recognized as an "amorphous concept" that cannot be defined with particularity, although it is generally interpreted to include the breach of the parent's duty to ensure a safe and nurturing shelter for her child. *Id.*

¶ 28　In this case, the State pursued two of the three counts in the second amended complaint at the adjudication hearing. We incorporate the relevant counts below in their entirety.

> "COUNT [II]. The minor is a neglected minor in that said minor is under 18 years of age and is not receiving the proper or necessary support, education, as required by law, or medical or other remedial care recognized under State law as necessary for the minor's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter, or who is abandoned by his or her parents or other person responsible for the minor's welfare *in that minor was left unsupervised on multiple occasions*, pursuant to 705 ILCS 405/2-3(1)(a).

> COUNT [III]. The minor is a neglected minor in that said minor is under 18 years of age and his environment is injurious to his welfare in that there is domestic violence in the home, thereby placing the minor at risk of harm, pursuant to 705 ILCS 405/2-3(1)(b)." (Emphasis added.)

The circuit court ultimately held that there was "a great amount of evidence" as to both counts.

¶ 29    We disagree with the circuit court's ruling with respect to count II. A reviewing court must determine the sufficiency of the evidence presented at a given hearing based upon the evidence actually presented to the circuit court. *In re Bobby F.*, 2012 IL App (5th) 110214, ¶ 23. A review of the evidence introduced at the adjudicatory hearing shows that the State failed to establish count II as alleged. As noted above, the State alleged P.S. was neglected because he was left *unsupervised* on multiple occasions. The trial court, however, found P.S. neglected because he was *inadequately* supervised by respondent, leading to injuries. As an aside, we also take issue with the fact that a 20-month-old child wet the bed as evidence of either no supervision or inadequate supervision. Indeed, had respondent not requested the new sheets for the bed, the State would have likely alleged that respondent was allowing the child to reside in his own filth. Respondent acted appropriately in requesting new sheets to be placed on the bed, to hold otherwise would be placing parents in similar positions between a rock and a hard place, and we decline to let that be the standard for failing to supervise a minor.

¶ 30    A review of the record, both the State's evidence and respondent's own testimony, shows no substantiated claims of P.S. being *unsupervised*. Because petitions for wardship are civil in nature and must therefore comply with general rules for civil pleadings, the State may not succeed on a theory that is not contained in its complaint. *In re J.B.*, 312 Ill. App. 3d 1140, 1143 (2000). The State did not establish that P.S. was left unsupervised, thus we hold that the circuit court's finding with respect to count II was against the manifest weight of the evidence and reverse that finding.

¶ 31    If count II was the only count the State alleged, we would necessarily reverse the entirety of the circuit court's adjudication order. See *N.B.*, 191 Ill. 2d at 343. However, the State also

alleged injurious environment due to domestic violence, which we hold is not against the manifest weight of the evidence. The State's evidence demonstrates that there have been several instances of domestic violence between respondent and Marvin at which P.S. had been present beginning from the time he was four months old. At least one of those incidents resulted in respondent being charged with three Class A misdemeanors, including one for domestic battery, and prompted both respondent and Marvin to file petitions for emergency orders of protection against each other. The petitions' narratives contain a torrid history of the parties' relationship, full of instances of domestic violence. All these incidents, taken together, demonstrate that respondent breached her duty to ensure a safe and nurturing shelter for P.S. *C.f. In re S.S.*, 313 Ill. App. 3d 121, 130 (2000) (holding the State did not meet its burden to establish the minor was neglected based on injurious environment due to domestic violence when there was only one instance of domestic violence between the parties, at which minor was not present). In sum, we conclude that the State proved by a preponderance of the evidence that P.S.'s environment was injurious to his welfare because of domestic violence between respondent and Marvin.

¶ 32                                    III. CONCLUSION

¶ 33      For the reasons stated, we affirm the circuit court of Winnebago's adjudication of neglect on count III and reverse its adjudication with respect to count II.

¶ 34      Affirmed in part and reversed in part.